# RANDOLPH'S EXECUTOR *v.* QUIDNICK COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF RHODE ISLAND.

No. 213. Argued March 13, 14, 1890. — Decided April 14, 1890.

A court of equity will not lend its aid to enforce a sale of property under execution where the disproportion between the value of the property sold and the sum paid for it is so great as to shock the conscience.

Where a debtor, having large and scattered properties and being much embarrassed, transfers his property for the benefit of his creditors equally, equity requires that any creditor who is not satisfied with the provisions of such transfer should act promptly in challenge thereof, or else be adjudged to have waived any right of challenge.

When the highest courts of two States arrive at different conclusions respecting the validity of an assignment by an insolvent debtor of all his property for the benefit of creditors, this court is inclined in matters of doubt, to give the preference to the ruling of the court of the State in which the insolvent resided, where the conveyance was executed, and where the bulk of the property is situated.

S., a citizen of Rhode Island engaged in business there, with large properties in that State and with property in Connecticut, being embarrassed, made an assignment in 1873 of all his property for the benefit of his creditors; which assignment, being assailed in the courts of each State, was upheld by the Supreme Court of Rhode Island as to the property there, and invalidated by the Supreme Court of Connecticut as to the property there. Meanwhile in the execution of its provisions, large transactions took place and extensive rights were created. In 1875 a creditor commenced suit against S., and in 1882, attached in that action property of the value of $500,000 which had belonged to S. before the assignment, and having obtained execution, levied upon it and sold it under execution for the sum of $275. The purchaser filed a bill in equity to enforce the purchase; *Held,*

(1) That the disproportion between the sum paid and the value of the property purchased was too great to warrant a court of equity in enforcing the purchase;

(2) That the long delay in attacking a transfer under which great rights had been acquired by other creditors, justified a court of equity in refusing to lend its aid to the attack;

(3) That if it were necessary, (which it was not,) to decide whether the assignment was or was not valid beyond challenge, the court would incline to give preference in matter of doubt to the ruling of the Supreme Court of Rhode Island, where S. resided, when the conveyance was executed, and where the bulk of the property was situated.

In EQUITY. Decree dismissing the bill. The plaintiff appealed. The case is stated in the opinion.

Mr. *Benjamin F. Butler* and Mr. *O. D. Barrett* (with whom was Mr. *A. B. Patton* on the brief) for appellants.

Mr. *William L. Putnam* and Mr. *Joseph C. Ely* (with whom were Mr. *C. Frank Parkhurst*, Mr. *Arthur L. Brown* and Mr. *Augustus S. Miller* on the brief) for appellees.

MR. JUSTICE BREWER delivered the opinion of the court.

On August 2, 1883, Evan Randolph, the testator of complainants, filed his bill in equity in the Circuit Court of the United States for the District of Rhode Island, for the purpose of establishing his title to 4022 shares of the capital stock of the Quidnick Company, claiming to have purchased these shares on execution sales in March, 1883, for $275. The Quidnick Company was a corporation organized under the laws of Rhode Island, in May, 1862, with a capital stock of $500,000, divided into 5000 shares. Prior to December 1, 1873, the corporation had purchased some of its own stock, so that there was then outstanding only 4349 shares, of which 327 were held by the estate of Edward Hoyt, deceased; and the remainder, being the 4022 shares in controversy, by Amasa, William, Fanny and Mary Sprague, and the A. & W. Sprague Manufacturing Company. At this time the Spragues, who were largely engaged in manufacturing and other business, became embarrassed, and executed the transfers hereinafter referred to, and which have become the source of much litigation. Notwithstanding the embarrassments of the Spragues, the Quidnick Company was entirely solvent, out of debt, and the owner of large properties. Its stock was valued, by a committee of the creditors of the Spragues at the time, at $374 a share; and the dividends which, in the winter after the filing of this bill, the stock was entitled to as the proceeds of the sale of property and otherwise, amounting to over half a million of dollars. In other words, these complainants are asking the

interposition of a court of equity to establish their title to property worth over half a million of dollars, obtained by purchase at execution sales for $275. The immense disproportion between the value and the cost shocks the conscience of a chancellor and forbids the supporting action of a court of equity. Some rights must have suffered and some wrong must have been done by such a transaction, and a court of equity properly says that it will not lend its aid to further such an unconscionable speculation. The case of *Mississippi & Missouri Railroad* v. *Cromwell*, 91 U. S. 643, forcibly illustrates this rule. In that case, Harrison recovered a judgment in the Circuit Court of the United States for the District of Iowa, against Muscatine County for $6500. Under an execution on that judgment, the marshal assumed to levy on seventeen hundred and fourteen shares of the capital stock of the Mississippi and Missouri Railroad Company, belonging to Muscatine County, and sold the same at public auction to Cromwell, for the sum of $50. The latter filed his bill against the railroad company and the county to compel a transfer of this stock. The case was presented to this court in two aspects: By one, the stock in the company was worthless, and in reference to that the court observed: "The property of the company was gone; its franchises were gone; the amount which the stockholders had arranged to realize was gone; and consequently the stock could have been nothing but an empty name, and the attempt to keep it afloat for speculative purposes is not such as should recommend it to a court of equity. The parties to such a transaction ought at least to be left to their remedies at law. A court of equity should have no sympathy with any such contrivances to gain a contingent or speculative advantage, if any such is to be gained." By the other, it appeared that through certain arrangements between this railroad company and another there was a possibility of realizing sixteen per cent on the par value of the stock, which, with interest to the time of the bringing of the suit, amounted to over $32,000. And with reference to that, the court said: "He comes into court with a very bad grace when he asks to use its extraordinary powers to put him in posses-

sion of thirty thousand dollars' worth of stock for which he paid only fifty dollars. The court is' not bound to shut its eyes to the evident character of the transaction. It will never lend its aid to carry out an unconscionable bargain, but will leave the party to his remedy at law." No language could be more appropriate to the case before us. Either this stock had been so appropriated by prior transfers and transactions as to be absolutely worthless in the hands of the Spragues, or else it represented more than half a million of dollars.

It is doubtless true that property of large value, both real and personal, may be incumbered with mortgages or other liens to an amount something like its value, so that there remains in the owner but an equity of redemption of trifling value; and a creditor may, at execution sale, or otherwise, buy at a small price such equity, with a view to redemption from the liens; and a court of equity will then lend its aid to put him in a position where he may safely redeem. But, as will appear from facts to be narrated subsequently, this is not such a case. The purchase was purely speculative. If the transfers theretofore made by the Spragues for the benefit of their creditors are sustained, the purchaser takes nothing. If they are not to be sustained they fail *in toto*, and the entire value of the property belongs to this purchaser. So his purchase is one simply to speculate upon the chances of successfully attacking transfers of large property, made for the benefit of creditors, and with the view of depriving them of the benefits of such transfers. It is a case where equity, true to its ideas of substantial justice, refuses to be bound by the letter of legal procedure, or to lend its aid to a mere speculative purchase which threatens injury and ruin to a large body of honest creditors, who have trusted for the payment of their debts to the legal validity of proceedings theretofore taken.

Again, beyond the question of amount, is the matter. of time. The transfers by the Spragues were in 1873. These execution purchases were in 1883. The transfers in 1873 were not made hastily, upon the judgment of the debtors alone, or without consultation with creditors. On the contrary, all creditors were invited, committees were appointed by them,

conferences had, and after weeks of examination and delibera-tion the substantial features of the arrangements were agreed upon between the creditors and debtors. The interests in-volved were immense. The committee of creditors appointed to examine into the assets and liabilities reported the former at $19,495,247, and the latter at $11,475,443. These assets were various in character — manufacturing stocks, real estate, stock in banks and other corporations, bonds, etc. They were widely scattered — in Rhode Island, Maine, Connecticut and other States and Territories. These various properties were placed in the hands of a trustee, to be managed and disposed of for the benefit of creditors; and the provisions of the ar-rangements were accepted by nearly all the creditors. By these arrangements it was provided that the trustee might continue the manufacturing business; and, in pursuance of the authority thus conferred, he did continue it, and before August, 1881, the amount of manufacturing business done by him was $29,802,286.10.

The executions under which the stock was purchased, as alleged, were issued upon two judgments — one in favor of Evan Randolph, and the other in favor of Horatio N. Water-man, each a creditor at the time of the transfers in 1873. Randolph commenced his action in October, 1875, as a per-sonal action against the Spragues. After service of summons, nothing seems to have been done until the 14th of August, 1882, at which time an attachment was issued, and an at-tempted levy made upon the stock. Judgment was rendered March 7, 1883. Waterman commenced his action in October, 1882, and immediately thereafter placed an attachment on the stock. It will thus be perceived that these creditors made no attack upon the validity of the transfers until 1882, nearly nine years after they had been executed, when nearly all of the creditors had accepted the provisions of the transfers; and the trustee, in consequence of the duties imposed upon him by the transfers, had done nearly $30,000,000 of manufacturing business, besides managing and disposing of other properties transferred. The transfers contemplated no preference be-tween creditors, and were for the benefit of all alike who

assented to its provisions. Indeed, if preferences had been contemplated, the bankrupt law of the United States was then in force, and might have been invoked to prevent any inequality between creditors. In fact, in the spring of 1874 bankrupt proceedings were commenced, but were withdrawn on the execution by the Spragues of additional conveyances, deemed necessary to perfect full title in the trustee. Under the circumstances, the long delay is sufficient to justify a court of equity in refusing any assistance to this attack upon the validity or sufficiency of the transfers. True, Randolph and Waterman did not become parties to the proceedings by which the property of the Spragues was placed in the hands of the trustee, and therefore are not estopped by any affirmative action in support thereof; but their inaction for such a length of time equitably forbids their present attack. They knew of the transfers at the time they were made; that they contemplated equality between the creditors; that nearly all the creditors assented thereto; that the trustee, relying thereon, was carrying on a vast and extensive business; that the doors of the bankrupt court were open; and that, if they were dissatisfied with the arrangements, they could invoke the aid of that court, whose rulings and proceedings would assure absolute equality between all creditors, and the appropriation of all the property of the Spragues for the equal benefit of such creditors. Yet they did nothing; they waited until the bankrupt law was repealed, until the result of the arrangements between the Spragues and their creditors, voluntarily entered into, was fully developed; and then, at the end of nine years, attempt to place a legal levy on a part of the transferred property, and say that the arrangements were illegal and wrong, and now invoke the aid of a court of equity to give them, for a trifling amount, a valuable portion of the property. If they were not satisfied with the legality and equity of the proceedings, they should have antagonized them sooner. Equity loves equality; and if they did not believe that these proceedings were legal and equitable, they should promptly have invoked the aid of the bankrupt court or made other assertion of legal rights. They might not equitably wait the outcome of the proceedings, expecting to

approve if they worked out full payment of all creditors, and ready to attack if the scheme proved a failure. Good faith to other creditors required that they act promptly. We do not rest this upon any mere statute of limitations. Equity, administering its remedies in accordance with its own rules, affirms that the best of rights may be lost by unreasonable delay in their assertion, and, when coupled with long delay is a scheme for great personal gain at the expense of equally deserving creditors, it refuses to lend its aid to the accomplishment thereof.

But we need not rest upon these considerations alone. The Circuit Court dismissed the bill, on the ground that the Supreme Court of the State of Rhode Island had decided that the first and principal conveyance by the Spragues to their trustee was valid under the state statute. *Austin* v. *Sprague Manufacturing Co.*, 14 Rhode Island, 464. This ruling it had followed in an earlier case, *Moulton* v. *Chafee*, 22 Fed. Rep. 26. Unquestionably, if that conveyance and the transfers immediately following were valid, the complainant's testator took nothing by his purchase.

It is unnecessary to place our judgment solely upon the decision of the Supreme Court of Rhode Island, in the case cited; and yet it is worthy of most respectful consideration, both because it is a decision of the highest court of the State in which the transactions took place, and also because it reviews all the objections made to the conveyance with clearness and ability. As to the construction of a state statute, we generally follow the rulings of the highest court of the State, *Bacon* v. *Northwestern Life Insurance Co.*, 131 U. S. 258, and cases cited in opinion; and as to other matters, we lean towards an agreement of views with the state courts, *Burgess* v. *Seligman*, 107 U. S. 20, 34. So, when the highest court of a State affirms that a conveyance, made by a debtor to a trustee for the benefit of creditors, is valid under the statutes of that State, we should ordinarily, in any case involving the validity of such conveyance, follow that ruling, even though that statute was common to many States, and in others a different ruling had obtained.

Now, in 1873, as heretofore stated, the Spragues became embarrassed, all creditors were invited to a consultation, a committee was appointed by them, frequent consultations were had, this committee reported the assets and liabilities, and a plan to meet the emergency was devised and agreed upon. This contemplated a conveyance by the Spragues to three trustees selected; the creditors were to grant an extension, taking notes due in three years; and the debtors were to convey to the trustees all their property, except shares of capital stock in corporations. These the trustees were unwilling to accept, for fear of personal liability consequent upon such acceptance; but a provision was inserted by which these shares were to be transferred to the trustees upon a request by them, by way of pledge or collateral security. After all this had been arranged, and the conveyance signed and executed, the trustees named before delivery of the instrument declined to act; and Zechariah Chafee was, without consultation with the creditors, named as trustee, and the instrument delivered. The committee representing the creditors, however, subsequently approved his selection. Chafee assumed the trust, and thereafter extension notes were issued to the various creditors and accepted by 449, these being all except the holders of about $114,000 of direct indebtedness. A question is made here as to whether this conveyance was re-executed by the grantors, after the substitution of Chafee as trustee in place of the three selected by the creditors. Upon this question the testimony is contradictory. The disinterested testimony, and therefore the most reliable, is in favor of the re-execution; and this testimony is strongly supported by the issue and acceptance of the notes, and by the fact that many years passed without challenge by debtor or creditor of the validity of the conveyance, or the rights and powers of the trustee. If the case turned upon this question of fact, we should have little hesitation in finding that there was a due re-execution of the conveyance. A due execution being established, another question is as to the validity of the conveyance under the statute of frauds. Here we turn to the decision of the Supreme Court of Rhode Island, cited supra; and that

decision is very persuasive. It would be unfortunate, to say the least, to have this conveyance sustained as to home creditors, and avoided as to foreign. So that, if this case stood alone upon the question of the validity of that conveyance under the laws of the State of Rhode Island, we should be reluctant to depart from the rulings of the Supreme Court of that State; and should do so only upon a clear conviction that the decision of that court was wrong, and that thereby the rights of foreign creditors were sacrificed. While this conveyance has received a different construction, and its invalidity been declared, by the Supreme Court of the State of Connecticut, *DeWolf* v. *Sprague Manufacturing Company*, 49 Connecticut, 282, so that it must be conceded that its validity is a matter of doubt, yet preference should be given in matter of doubt to the ruling of the Supreme Court of the State in which the parties resided, where the conveyance was executed, and in which was the bulk of the property. We do not feel called upon to decide, as a question of absolute law, whether the conveyance was or was not valid and beyond challenge. It is enough for the purposes of this case, that it was with the general acquiescence of the creditors; that its purpose was equality between them; that it was not challenged for many years; that the trustee, on the faith of its validity, carried on business to an enormous extent and assumed large liabilities; and that the creditors accepted payments made out of the proceeds of that business, and the trust created by this conveyance. Equity will not reach out its hand to disturb that which all parties have considered settled for so many years.

Another matter requires notice: The conveyance excepted shares of stock belonging to the grantors; but gave to the trustee a right to insist upon the transfer thereof, by way of pledge and collateral security. This exception was introduced into the instrument for fear that the trustees by accepting the stock would assume personal liability for the debts of the various corporations. Immediately after accepting this trust the trustee demanded a transfer of the stock in the Quidnick Company; and on December 2, 1873, the various grantors in this conveyance transferred on the stock transfer book of the

Quidnick Company, to the trustee, their shares of stock. These transfers, as expressed, were " by way of pledge and collateral security, to secure the performance of the conditions of the trust mortgage." Some question is made as to the meaning of these transfers; but obviously they were all collateral security for the payment of the debts of the transferrers, as provided for in the trust deed. Such was the conclusion reached by the Supreme Court of Rhode Island in the case cited; for they say, " with reference to the stock in question, it was transferred to be applied to creditors, according to the terms of the mortgage." So that we have the validity of the original conveyance by the Spragues, and the immediately subsequent transfers of the stock in question, affirmed by the Supreme Court of the State in which the grantors and transferrers resided, and where the corporation was situate whose stock was thus transferred. This affirmance of the legal validity stands behind, and gives large support to the views which we have hitherto expressed. The law as declared by that court harmonizes with and endorses the equitable considerations which in this case impress us.

We deem it unnecessary to proceed further, or to consider the effect of the equitable suit instituted by the trustee, in the state courts, prior to these attachments, and the possession taken by those courts of the property of the Quidnick corporations, or the sales of that property in pursuance of proceedings had therein. Indeed, we have referred to all these proceedings in the state courts as in support of the equitable considerations upon which we affirm the ruling of the Circuit Court. In conclusion, it may be said that, generally, where a debtor, having large and scattered properties, and being much embarrassed, transfers his property for the benefit of his creditors equally, equity requires that any creditor who is not satisfied with the provisions of such transfer shall act promptly in challenge thereof, or else be adjudged to have waived any right of challenge.

The decree of the Circuit Court is                    *Affirmed.*

Mr. Justice Blatchford did not take any part in the decision of this case.