## STURM et al. v. WIESS et al.

## WIESS et al. v. STURM et al.

(Circuit Court of Appeals, Eighth Circuit. May 3, 1921.)

Nos. 5638, 5639.

**1. Mines and minerals ☞74—Purchasers of interest in oil leases held protected as bona fide purchasers.**

Purchasers of a half interest in oil leases for $5,000, which was then considered more than the value of the entire leases, who agreed to develop the property at their own risk, and who expended therein more than $20,000, with the result of bringing in valuable wells, *held* protected as bona fide purchasers, as against claims of stockholders of the former corporation that a judgment against it, under which the leases were sold, and under which the purchasers derived title, was fraudulent, which claims were not known to them and were not asserted until six years after the suit, and after the property had been rendered valuable by their expenditure.

**2. Equity ☞72(4)—Doctrine of laches strictly enforced respecting claims to mining property.**

In view of the uncertain and fluctuating value of mining property, persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches is more relentlessly enforced.

**3. Corporations ☞619—Property of corporation acquired by liquidating director held in trust for all stockholders.**

Where the directors of an insolvent corporation, whose indebtedness was to its stockholders for money lent by them in proportion to their stock holdings, were authorized by the stockholders to sell its property to apply on the indebtedness, and one of the directors, who was also a creditor, afterwards acquired title to the property under a judgment obtained on notes held by him and another, he held such title in trust for the benefit of all stockholders.

**4. Corporations ☞546—Speculative purchaser of stock of insolvent corporation held not entitled to share in recovery by original stockholders.**

A stranger, who for speculative purposes and for a nominal price, bought stock of an insolvent corporation, knowing that its property had been sold, and who stood by while the purchasers at large expense developed the property and made it valuable, *held* not entitled to share in an equitable interest therein recovered by the original stockholders.

Appeal from the District Court of the United States for the Western District of Oklahoma.

Suit in equity by Lizzie E. Wiess, executrix, and others, against H. L. Sturm, executor, and others. From the decree, both parties appeal. Reversed.

C. B. Stuart, of Oklahoma City, Okl. (Stuart, Sharp & Cruce, of Oklahoma City, Okl., and John Broughton and L. A. Carlton, both of Houston, Tex., on the brief), for plaintiffs.

Charles A. Steele, of Tulsa, Okl., H. L. Stuart, of Oklahoma City, Okl., and A. B. Honnold and Preston C. West, both of Tulsa, Okl. (Roger S. Sherman, A. A. Davidson, Gray Carroll, and H. D. Mason, all of Tulsa, Okl., and W. A. Ledbetter, R. R. Bell, and E. P. Ledbetter, all of Oklahoma City, Okl., on the brief), for defendants.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before HOOK and CARLAND, Circuit Judges, and LEWIS, District Judge.

LEWIS, District Judge. This suit was instituted in April, 1914, by William Wiess, Joseph S. Cullinan, Fred Fleming, and Estelle B. Sharp as executrix of the estate of W. B. Sharp, deceased, against H. L. Sturm and James R. Sharp, executors of the estate of J. W. Sturm, deceased, J. W. Sloan, J. E. Crosbie, G. S. Davis and another, and comes here on cross-appeals. Its purpose was to obtain an adjudication of alleged equitable rights and interests in three oil and gas leases on three separate tracts in Pawnee County, Oklahoma. They were all given in the summer of 1904, and in January, 1906, by several assignments, there was lodged in the Tex-I-Kan Petroleum Company, a Texas corporation, an undivided three-fourths interest in the lease on 80 acres, and an undivided half interest in each of the other two leases, each on 40 acres. Each lease required that the land should be prospected for oil and gas, that the lessors should receive one-eighth of the oil produced, and stipulated amounts per annum for gas from each well. The right to maintain the suit is based on the fact that each plaintiff claims to be a shareholder in the Tex-I-Kan company, which had failed, and it is alleged that J. W. Sturm and defendants Crosbie and Davis, through certain fraudulent acts, obtained and continue to hold title to all of the leaseholds. The challenged titles were procured in this way: In July, 1909, one Sharp recovered judgment in an action which he began in December, 1908, in the United States Circuit Court for the Western District of Oklahoma against the Tex-I-Kan company for $14,505.41. On execution sale in January, 1910, the three leaseholds, and some personal property on the premises, used to develop, pump and handle oil and gas, were bought in by Sharp for $4,716. The United States Marshal delivered his deed, dated February 18, 1910, conveying to Sharp the property sold, and thereafter, in October, 1911, Sharp conveyed all he had purchased to J. W. Sturm, and thereafter, in 1912, Sturm conveyed an undivided half interest in what he received from Sharp to Crosbie, who in turn assigned an undivided half in what he received from Sturm to Davis, for which Crosbie and Davis paid $5,000. So that the leasehold interest in the three tracts that had belonged to the Tex-I-Kan company had become vested, one-half in Sturm, and the other half in Crosbie and Davis. It is alleged that J. W. Sturm and the defendant Sloan were officers and stockholders in the company, that they assigned the company's notes which they held to J. W Sharp without consideration therefor, and procured him to bring said action thereon against the company in the United States Circuit Court and to recover judgment for their benefit, that he afterward sued out execution and had the sale made, at which he purchased the company's property for their use and benefit and later conveyed it to Sturm, that the plaintiffs were without knowledge that that was being done, and that as against them and other stockholders all of those proceedings were void.

The right to the relief sought was said to grow out of a trust relation between Sturm and Sloan, two officers in the corporation, and the

stockholders; and Crosbie and Davis were said to have purchased with knowledge of that relation. The principle relied on, in so far as Sturm's estate may be affected, was stated in Morgan v. King, 27 Colo. 539, 63 Pac. 416, and by this court in Wheeler v. Building Co., 159 Fed. 391, 89 C. C. A. 477, 16 L. R. A. (N. S.) 892, 14 Ann. Cas. 917, though it must be observed that in neither of those cases did corporate property pass by judicial sale, but the transactions were private and dominated by those in control of the corporation, to their advantage. Indeed, it is admitted here that a corporate officer who is a bona fide creditor has a right to judicial process against corporate assets in satisfaction of the debt, subject to notice to other stockholders, or others interested, of his intended action, thus affording them an opportunity for self-protection. And it is claimed that plaintiffs had no notice, and that Sturm and Sloan went about it in a way to prevent notice and for that purpose.

The decree ordered that the judgment procured by Sharp, the sale at which he purchased, and the Marshal's deed to him, his conveyance to Sturm and Sturm's conveyance to Crosbie and Davis be canceled, and found that the shareholders in the Tex-I-Kan company were the equitable owners of the three leaseholds in proportion among them to the shares that each held, to-wit: J. W. Sturm's estate 368⅔ shares, William Wiess' estate 15⅓ shares (Wiess died pending the cause), Joseph W. Cullinan 10 shares, W. B. Sharp's estate 10 shares, and Fred Fleming 82⅔ shares; but it held that Fleming had no standing as a party to the cause, though entitled as a stockholder to participate pro rata in the fruits of the litigation. Crosbie and Davis and Sturm's estate were ordered to make an accounting for the oil taken from the premises by them, and that the leaseholds be sold by the Master and the proceeds divided among the shareholders.

[1] Considering, first, the record as to Crosbie and Davis, the material facts are these: The Tex-I-Kan company was incorporated in May, 1904, and in July, 1909, the proper State official, acting under a Texas statute, declared that the company had forfeited its franchise rights as a corporation to do business, on account of its neglect to pay the required franchise tax; and since that time it has been defunct. It had an authorized capital of $50,000, divided into 500 shares, which were not all issued. Its assets were the leaseholds and personal property above noted. It drilled for oil on the leased property, but the venture was a failure. It put down wells to a depth of 1,700 feet, but they did not produce enough to pay the expense of keeping them going. It obtained the money it needed from its stockholders and gave them its notes, and spent the money thus borrowed in trying to find oil. It could not pay its notes nor the interest that accrued on them. It became wholly insolvent. At its last stockholders' meeting, held in January, 1908, it was resolved

"that the officers of the company be authorized and requested to make an effort to realize on the assets of the company, and to pay the debts of the company."

At that meeting J. W. Sturm, J. W. Sloan and Fred Fleming were elected directors, and they constituted the board. Sturm was made

president, and Sloan, secretary and treasurer. Sturm held the company's note for $2,184.75, and had also purchased notes of the company given to other of its stockholders along with their stock. Sloan held the company's note for $1,080. All of these notes were long past due. Nothing had ever been paid on them. These were the notes which Sturm and Sloan assigned to J. W. Sharp and which he put into judgment, as above stated. After he obtained judgment, took out execution and had the levy made, the court, under a State statute, ordered an appraisement of the property levied upon by disinterested parties. They appraised the value of the company's interest in the leases at $650, and the personal property at $2,528. Sharp bought it all in for $4,716. After Sharp received the Marshal's deed it was about a year and a half before he conveyed what he purchased to Sturm; and after that the matter rested for six months before Sturm conveyed to Crosbie and Davis.

In addition to the $5,000 that Sturm was to receive for an assignment of the half interest to Crosbie and Davis, they agreed that they would, at their own risk and expense, develop the properties by sinking deeper wells on the tracts than had theretofore been put down. If the wells should prove to be profitable they were to first take out the expense of sinking them; otherwise they would sustain the entire loss. Crosbie and Davis at once began the sinking of these wells, on which they expended more than $20,000, and within about three months after obtaining the assignment from Sturm they brought in a valuable well at greater depth on one of the tracts. They continued development and all three tracts proved to be highly valuable for oil. When Crosbie and Davis attempted to enter one of the tracts they were resisted with force by adverse claimants. It was asserted that the rights under the leases under which Crosbie and Davis were claiming, and which they had gotten from Sturm, had lapsed. Values had suddenly increased since the putting down of the first deep well. Crosbie thereupon sought counsel, and was advised to settle with the adverse claimants, which he did at once by paying them $14,000. While Crosbie and Davis were spending their money and taking a chance as to whether they would ever receive any returns, none of the plaintiffs made any claim of any right or interest on behalf of the old Tex-I-Kan company or its stockholders. In June, 1913, seven months after the death of Sturm, and long after Crosbie and Davis had brought in paying wells, Sloan sued Sharp, Sturm's executors and Crosbie in the State court, and alleged that he entered into an agreement with Sturm, deceased, when he and Sturm assigned the notes given by the company to Sharp, that Sharp, acting in their behalf, should sue the company, obtain judgment against it, buy in the company's property and assign the three leases to Sturm for the benefit of Sturm, and himself, he to have a third interest, substantially in proportion to the stock theretofore held by him and Sturm in the old company and the indebtedness of the old company to them. Crosbie at that time had not paid the $5,000 represented by his note to Sturm for the assignment from Sturm, and Sloan alleged that he was entitled to one-third of the $5,000 due from Crosbie, and prayed that Crosbie be required to deposit the sum

in court for division between him and Sturm's estate. That suit was never tried. Sturm's estate bought Sloan out. The court below held that inasmuch as the $5,000 for the assignment from Sturm had not been paid prior to the bringing of the suit by Sloan, that that suit advised Crosbie of sufficient facts to put him on inquiry as to Sturm's title, and that if that inquiry had been pursued Crosbie and Davis would have been advised of the claimed invalidity of all of those proceedings; and therefrom the court reached the conclusion that Crosbie and Davis were not innocent purchasers for value. In reaching that conclusion the court gave no weight to the large expenditures made by Crosbie and Davis before their rights under the assignment from Sturm were challenged or put in question. We think the court erred in that respect, for these reasons: Sloan's suit was not brought until after Crosbie and Davis, by large expenditures of their means, had made the property of great value, and there is nothing to impugn their good faith in doing so, and in reliance upon the validity of their title; because Crosbie testified that he had no recollection whatever of ever hearing anything about the Tex-I-Kan company until after the wells were put down by him and Davis, and that no question was raised about the title conveyed to them by Sturm until after some of the wells had come in; Sloan's suit was not brought by him as a stockholder in the Tex-I-Kan company and he asserted no rights as such, but his claim therein set up was rested on an agreement with Sturm, i. e., that he and Sturm would take whatever they obtained through that suit in the proportion of their stock holdings in the old company and the indebtedness of the old company to them, and that suit did not challenge but confirmed on the part of Sloan the assignment to Crosbie,—the only relief that he asked against Crosbie being a one-third interest in Crosbie's $5,000 note given for the assignment and then unpaid; if all stockholders had consented, actually or impliedly, to the sale of the company's assets under Sharp's judgment, those proceedings could not have been avoided thereafter by them, and there is no proof that Crosbie and Davis knew they had not consented; and because the laches of the plaintiffs at the time they brought this suit barred them from the right to any relief against Crosbie and Davis, for the transactions of which they complain were not void, but only voidable.

There is no proof that Crosbie or Davis had actual notice of the facts on which the plaintiffs rely, and if they had ferreted out those facts they would have learned that Sturm and Sloan were officers of the old company, that they had been given authority to sell its property, and that Sharp's judgment was obtained on the company's debt evidenced by its notes long past due. But they were not put upon that inquiry. Reed v. Munn, 148 Fed. 737, 756, 80 C. C. A. 215.

[2] Between the bringing of the suit by Sharp against the company and the assignment to Crosbie and Davis, four years had elapsed, and a year and a half more passed before this suit was brought. Crosbie and Davis had developed property that had been practically abandoned by the corporation and its stockholders as worthless. They had given it no attention whatever since January, 1908, when they ordered it

sold as a means of paying the company's debts. In Patterson v. Hewitt, 195 U. S. 309, 321, 25 Sup. Ct. 35, 38 (49 L. Ed. 214) it is said:

"There is no class of property more subject to sudden and violent fluctuations of value than mining lands. A location which today may have no salable value may in a month become worth its millions. Years may be spent in working such property apparently to no purpose, when suddenly a mass of rich ore may be discovered, from which an immense fortune is realized. Under such circumstances, persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced."

See also Hammond v. Hopkins, 143 U. S. 224, 250, 12 Sup. Ct. 418, 36 L. Ed. 134; Johnson v. Mining Co., 148 U. S. 360, 370, 13 Sup. Ct. 585, 37 L. Ed. 480; Alsop v. Riker, 155 U. S. 448, 460, 15 Sup. Ct. 162, 39 L. Ed. 218; Johnson v. Transit Co., 156 U. S. 618, 647, 15 Sup. Ct. 520, 39 L. Ed. 556.

The decree provides that Crosbie and Davis shall be reimbursed for the expenditures that they made, but that is not the full measure of their rights. They took the hazard of losing all they put in. In Patterson v. Hewitt, supra, it is further said:

"While it is true the court might impose upon the appellants the payment of their proportionate share of labor and expense as a condition of relief, it could not compensate the defendants for the risk assumed by them that their exertions would come to naught."

It is fair to assume that if those exertions had come to naught, these plaintiffs would not have stood ready to share any part of it. They waited until they were assured that the property had been made valuable at the expense and risk of Crosbie and Davis, and then asserted their rights, after they felt assured that to do so would be profitable to them. The interests of Crosbie and Davis should be confirmed in them as against all stockholders.

Moreover, putting out of the case for the moment the rights of Crosbie and Davis as against plaintiffs, even so, the interest assigned to them by J. W. Sturm could not be withheld from them in a court of equity by his estate, when it is found that its equitable interest in the property on a stock basis in the old company is as great as that which he assigned to them; and if plaintiffs had been entitled to prevail against them they should have been thus protected. But the plaintiffs failed and their complaint should have been dismissed as to Crosbie and Davis, with costs to them.

[3] The defendant Sloan had no interest in the subject matter in controversy in this suit which the court adjudged belonged to stockholders, but did claim some interest in the lands leased, which he alleged was obtained entirely independent of any claim or title derived from the Tex-I-Kan company. He relinquished to Sturm's estate, on settlement of the suit which he brought, any interest which he theretofore asserted in the leases. Having been brought in as a defendant he denied, in his answer, the charges of fraudulent conduct made against him, Sturm and Sharp, and defended against them. We see no occasion for extending the decree against him, further than for costs. But how stands the case between the stockholders and Sturm's

estate? J. W. Sturm died in November, 1912, one year and seven months before the bringing of this suit. He could not be heard in defense of the charges that were made, or in explanation touching his conduct. He was the chief party in interest. He had taken over the company's notes given to other stockholders for money advanced, when they desired to get out of the company, and had also bought their stock. He carried the burden of the old company's debts. He had been authorized at a stockholders' meeting in 1908 to sell the company's property and pay its debts. He did not act hastily in executing that instruction, but waited almost a year before assigning the company's notes which he held to Sharp, in order that Sharp might bring suit. He might have sued in his own name. Sloan could have brought suit on his note, but instead of taking that course they had Sharp bring the one suit. That suit was not pressed to judgment and execution with haste, and after Sharp bought in the property Sturm waited until in October, 1911, before he took the assignment from Sharp. If he could have been heard at the trial we might have learned that during the lapse of almost four years between the authorization by the stockholders and the taking of the title in Sturm's name, Sturm was waiting with the hope that other stockholders would manifest an interest, that something would be done, that he would get back the money that he had advanced for their benefit; and after he took the title from Sharp he waited again for six months and then assigned the half interest to Crosbie. The record is barren of fraudulent conduct on the part of J. W. Sturm. The most that can be contended for is that his relation to the corporation and his acts raised a constructive trust in behalf of the other stockholders. That appears to have been the principle on which the trial court acted. We think there is enough to sustain it.

[4] But the plaintiff Fred Fleming stands in a very different attitude than the other plaintiffs, and his relation to J. W. Sturm and his estate, and to the property involved, is vastly different. The court found that Fleming owned 82⅔ shares, that while his standing was not such as to entitle him to appear as a plaintiff he was entitled to prorate with other stockholders in the recovery. We do not think so. In May, 1908, Fleming was adjudged a bankrupt and the title to his 82⅔ shares thereupon became vested in his trustee. During the administration of the bankrupt estate these shares were sold by the trustee under approval of the bankruptcy court, along with other odds and ends of the bankrupt estate, for $500, to three gentlemen who took them as trustees for the creditors of a bank in which Fleming had theretofore been largely interested and which had failed. Some time thereafter, and in 1911 or 1912, the exact date not being definite in the record, Fleming, through a man by the name of White, who lived in Oklahoma and was a stranger to the three trustees, who lived in Texas, purchased back from these three trustees the certificate for 82⅔ shares for $25. White told the trustees at the time of the purchase that all of the property of the Tex-I-Kan company had been sold, and Fleming testified that he knew at the time White made the purchase that all of the company's property had then been sold. Later the trustees were informed that the shares might become of considerable value. They thereupon com-

plained to Fleming and called his attention to the fact that they had been induced to sell for a nominal sum on the representation that the shares had little if any value. Whereupon Fleming made a written contract with the trustees that he would give back to them one-half of the net amount which he might eventually receive for the shares. It thus appears that when Fleming, through White, purchased the certificate for $25 in 1911 or 1912, he then knew that the property of the Tex-I-Kan company had all been sold. Before he made that purchase he was a stranger to the Tex-I-Kan company and to the relations between it and its stockholders, and to Sturm. He had no interest whatever in its property, and being a stranger he bought solely for speculative purposes, and when the three trustees took back from him they placed themselves in the same position. He then stood by with "shut eyes and hand on mouth," awaiting developments. White had doubtless advised him that the chance was worth a song. Such suitors are not regarded with favor in equity. Their delay, without more, bars them. This court, in Curtis v. Lakin, 94 Fed. 251, at 256, 36 C. C. A. 222, 227, said:

"Where delay is occasioned by motives of the latter sort,—that is, by waiting to see whether developments undertaken by those in possession will be successful or otherwise,—a litigant is justly chargeable with bad faith, which courts of chancery always aim to discourage."

And the Supreme Court, in Randolph v. Quidnick Co., 135 U. S. 457, 10 Sup. Ct. 655, 34 L. Ed. 200, announced the rule that a court of equity will not lend its aid to a mere speculative purchase. Equity refuses to lend its aid to one seeking its active interposition, who has been guilty of unconscientious or inequitable conduct in relation to the matter in litigation. 1 Pomeroy's Equity Jurisprudence, § 397 et seq.; McKnight v. Taylor, 1 How. 161, 11 L. Ed. 86. If the shares are allowed to participate, the part apportioned to them would come out of the estate of Sturm. After the death of Sturm, and after Crosbie and Davis, at their hazard, had developed the property into one of large value, Sturm's executors then joined with Crosbie and Davis in further development and operation of the properties. The executors thus made expenditures and assumed obligations for the estate while Fleming, resting on his speculative investment, continued to stand by and wait until this suit was brought in April, 1914. The legal title to all of the company's properties had passed out of it and was vested in Sturm long prior to Fleming's purchase of the certificate. His equities, if any, in the property are not as great, and do not appeal with as much force to the conscience of a chancellor, as those of the estate of Sturm. Even if the equities of the two were equal, Sturm's estate, holding the legal title, must prevail. We think he is not entitled to participate at the expense of Sturm's estate.

The appeal of the executors of William Wiess challenges the finding of the court as to the number of shares owned by the Wiess estate, the claim being that the court should have allowed 35⅓ instead of 15⅓ shares. On this subject the proof was somewhat in conflict and in no respect clear, and we are not able to say that the court erred in that regard.

Inasmuch as Sturm took the property in trust for the other plaintiff stockholders they should be made whole in their rights, notwithstanding Sturm conveyed a half interest to Crosbie and Davis. It is therefore necessary that the shares found by the court to belong to Wiess, Cullinan, and W. B. Sharp's estate be doubled in number, or else cut in half the 368⅔ shares held by Sturm's estate, for the purpose of pro-rating in the remaining half held by the estate of Sturm. Sturm's estate should account for the $5,000 received from Crosbie and Davis and the net proceeds, if any, from the property, and be credited with the indebtedness of the company to Sturm which went into the judgment. With instructions to enter a decree in accordance with the views herein expressed, the decree appealed from is

Reversed.