**ELDER et al. v. WESTERN MINING CO. et al. (two cases.)**[*]

(Circuit Court of Appeals, Eighth Circuit. March 15, 1922.)

Nos. 5632, 5633.

1. **Mines and minerals** ⬅105(2)—**Stockholders of mining company held estopped to attack validity of lease.**

A mining corporation, by its directors, leased its property for 10 years, and by two successive extensions extended the term to 20 years. The lease was not ratified by the stockholders, which was essential to its validity, under Rev. St. Colo. 1908, § 865. Complainants and interveners, who were stockholders, were fully informed of the making of the original lease and its terms, and while they had no actual knowledge that it had not been ratified, nor of the extensions, they had notice of all

---

stockholders' meetings, at most of which they were present or represented, and made no inquiry, but for 15 years continued, without objection, to receive and retain dividends, which they knew came from royalties paid by the lessee. They also knew that the lessee was expending large sums in the exploration, improvement, and operation of the mine. *Held,* that they were estopped to thereafter attack the validity of the lease, because not ratified as required by the statute, which is for the sole benefit and protection of stockholders.

2. **Courts** ⬤⟹313—**Intervention by citizens of same state as defendants held not to oust jurisdiction.**

Allowance of a petition of intervention, which raises no new issues, will not oust the jurisdiction of a federal court because of the fact that petitioners are citizens of the same state as defendants.

3. **Appeal and error** ⬤⟹887—**Petition for intervention may be granted by appellate court.**

Where a petition for intervention has been denied by the trial court, but the rights asserted by petitioners are identical with those of complainants and can be determined on the same record, at the request of petitioners, and without regard to their right of appeal, the appellate court may consider the petition and allow the intervention.

Appeal from the District Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

Suit in equity by Rufus C. Elder and Frank E. Mann, executors of the will of George W. Elder, deceased, and Frank E. Mann, against The Western Mining Company and others. Complainants appeal from the decree, and by George R. Elder and Ida D. Elder appeal from an order denying them leave to intervene. Petition to intervene granted, and decree affirmed.

See, also, 237 Fed. 966, 150 C. C. A. 616; 263 Fed. 414.

Robert Dull Elder, of Leadville, Colo., for appellants.

Henry C. Vidal and Henry A. Dubbs, both of Denver, Colo. (John A. Ewing and Frazer Arnold, both of Denver, Colo., on the brief), for appellees.

Before CARLAND and STONE, Circuit Judges, and MUNGER, District Judge.

STONE, Circuit Judge. The statutes of Colorado (section 865, R. S. 1908), during the period here involved, as construed by this court (Westerlund v. Black Bear Mining Co., 203 Fed. 599, 121 C. C. A. 627), required ratification by the stockholders of leases of the entire property of a Colorado mining corporation. The Westerlund Case also decided that this provision was for the sole benefit of the stockholders, who could ratify such lease by estoppel, or who could attack its validity.

In January, 1899, the Adams Mining Company, a Colorado corporation engaged in mining, leased all of its property to Samuel D. Nicholson for a term beginning May 14, 1899, and ending January 14, 1909. June 1, 1904, this lease was extended, to end January 1, 1914. December 10, 1910, there was a further extension, to end January 1, 1920. The rights under these instruments passed successively to the A. M. W. Mining Company and to the Western Mining Company. This lease and both extensions were made by the board of directors of

the Adams, without the ratification by the stockholders required by the above statute.

December 3, 1914, Rufus C. Elder and Frank E. Mann. as executors of George W. Elder, deceased, and Frank E. Mann, individually, filed this bill, as stockholders of the Adams, to have the above lease and extensions declared void, because not ratified by the stockholders, and for an accounting from the lessees. The defendants against whom service was secured were Nicholson, the A. M. W., the Western, and, certain officials of these two companies and of the Adams. From dismissal of the bill on motion, an appeal was taken to this court, where the bill was deemed sufficient, and the case remanded for trial. Elder v. Western Mining Co., 237 Fed. 966, 150 C. C. A. 616. On remand, the issues were made, and a trial upon the merits had before a master, resulting in findings against complainants. Upon review by the trial court, the findings of the master were substantially sustained, and judgment entered dismissing the bill upon the merits. After the master had filed his report, George R. Elder and Ida D. Elder asked, and were denied, leave to intervene as parties plaintiff. These appeals are by complainants, from dismissal of the bill, and by George R. Elder and Ida D. Elder, from denial of leave to intervene. We shall first consider the main case.

The lack of ratification by the stockholders at the time the lease and extensions were made is admitted, as are also the facts that such lessees have had complete possession during the entire terms thereof, have developed and mined the property, and have extracted large quantities of ore from the mine. The defenses were that the lease and extensions had been ratified by subsequent stockholders' meetings, that they had been ratified by the stockholders through conduct constituting estoppel, and that these particular complainants were estopped by their conduct and laches from avoiding the lease and extensions. The master found that there had been no binding ratification at subsequent stockholders' meetings, but that these complainants were estopped by their conduct from questioning the lease and extensions. The trial court left undetermined the matter of ratification at stockholders' meetings, but approved the findings of the master that estoppel of these complainants existed.

The issues presented in this appeal may be generally classified as follows: (1) Were the lease and the two extensions properly ratified at subsequent meetings of the stockholders? (2) Can ratification thereof be legally made by a majority of the stockholders, by conduct or action other than by vote at a regular meeting thereof? (3) Can an individual stockholder be estopped by his conduct from contesting a failure to properly approve or ratify such instruments at a regular stockholders' meeting? (4) Are complainants estopped by their conduct from so contesting? The master and the court below cast the case on the third and fourth points above. Clearly, if they were right, the other two are immaterial. Therefore it seems logical to examine these contentions before approaching the other two.

[1] In our judgment, the former appeal of this case (237 Fed. 966, 974, 150 C. C. A. 616), has settled the law that a stockholder may, by

conduct, estop himself from questioning the validity of a lease given without the approval required by the Colorado statute. That leaves the inquiry as to whether these particular stockholder complainants have so conducted themselves as to be estopped. The record in this case covers 2,600 printed pages, much of which bears upon this issue. It has required much time and study to read, collect the scattered fragments, and compare the results, so as to make a connected narrative of what seem to be the essential facts as shown thereby. We deem the following to fairly outline the facts as thus shown:

The Adams Mining Company was organized in 1883. Until 1887 the control was in certain persons living in New York, and the main office was located there. In 1887 J. J. Sylvester, of St. Louis, secured control, was elected president, and moved the main offices to St. Louis. Shortly afterwards his son, W. W. Sylvester, was elected secretary-treasurer. Soon after J. J. Sylvester died, December 16, 1903, W. W. Sylvester was elected president, and the main offices were moved to Kansas City. The company books and records were kept at the main offices.

The business of the Adams Company was the development of slightly less than 10 acres of mining claims acquired by it in the Leadville district. This property was operated by the company until 1887, during which time it paid dividends of about $539,000 on a par capital stock of $1,500,000. Production practically ceased from 1887 to 1889. In May, 1889, the property was leased to David H. Moffatt for five years. Two extensions carried the Moffatt control to May 14, 1899. During 1891 and up to January 30, 1892, dividends totaling $82,500 were paid. In 1895, one dividend totaling $6,000 was paid. Moffatt practically ceased operating in 1896 or 1897 and the property became partially filled with water. The ore bodies in sight were large, but the ore was unmarketable, because of low grade and zinc penalties. The expense of fighting the water was prohibitive; there was no proper shaft for pumping and mining; there was no sufficient mill to concentrate the character of ores then found, and the company had practically no money. This was the condition of the property in 1899. About that time, David Nicholson, an experienced operator in that district, conceived the idea of combining the Adams property with several adjoining properties and operating them as a unit. With this purpose, he secured a lease upon the Adams property for a term of approximately ten years, beginning at the expiration of the Moffatt lease, May 14, 1899. This lease was made by the board of directors of the Adams Company, and was recorded May 20, 1899. June 10, 1899, the president of the Adams Company, by circular, truthfully notified all stockholders of this lease, that it was for ten years, and the general terms thereof, including the royalty rates. June 1, 1904, this lease was extended to January 1, 1914, and on October 31, 1910, was again extended until January 1, 1920. It is this lease and these extensions which are here attacked.

The stock connection of the complainants and interveners with the Adams was as follows: George R. Elder was a lawyer, mine owner, and operator of large experience living at Leadville. His wife is the

intervener Ida D. Elder. His father, George W. Elder, and his brother-in-law, Frank E. Mann, lived in Pennsylvania. In 1890, George R. Elder bought 4,200 shares (par value $42,000) of the Adams stock, and, shortly thereafter, transferred a portion thereof to his father, and also bought other stock in the Adams for his father, as well as $16,-000 of the Adams bonds for his father and other members of the family. His father died, owning about 10,000 shares of this stock, in November, 1901. Shortly afterwards, Rufus C. Elder and Frank E. Mann qualified as executors. Rufus C. Elder had no connection with the Adams property until in 1901, when he became executor; later, in 1913, he became a stockholder on his own account. Frank E. Mann became a stockholder (3,000 shares) in 1890 on the recommendation of George R. Elder, and late in 1901 had the additional interest in the property as an executor of the estate of George W. Elder. Ida D. Elder acquired 1,100 shares of stock in 1890, and later inherited 500 shares from her mother. It thus appears that George R. Elder, Ida D. Elder, and Frank E. Mann have had substantial holdings of stock in the Adams Company since 1890, and that Rufus C. Elder, as executor, has been interested therein since late in 1901.

There is no doubt that all of these parties, except Rufus C. Elder, knew, within a month of the commencement of this lease, all of the essential facts concerning the original lease. These facts they learned from the circular sent out by J. J. Sylvester, president of the Adams Company. This circular, inter alia, informed them that the lease was made to Nicholson, with right of assignment to a corporation to be formed by him and other named persons; that the term was ten years; that certain specified royalties were to be paid; that certain taxes and other obligations were to be met by the lessee; that this property was to be operated in common with certain other named properties from a shaft upon the Wolftone properties; that expensive operations (such as enlargement of shaft, further sinking of shaft, and installation of a large pumping plant) were required of the lessee. It does not appear that Rufus C. Elder ever saw this circular, as his connection with the property did not begin until more than two years after its issue; but he appears in this suit solely as one of the executors of George W. Elder. The other executor, Mann, received this circular, and his knowledge was that of the estate. Therefore it may be said that the complainants and the interveners knew all of the essential terms of the original lease. While the claim, as made, may be true that none of them knew of the dates or terms of the two extensions of this lease, it is certainly true that they knew that the original lease would and did expire in 1909, and they knew that thereafter the property was being operated under some kind of lease involving the payment of royalties. They received and retained 26 dividends between 1900 and 1916, inclusive. Eight of these were after 1909, and 5 were after the filing of this complaint. They knew, all of the time, that these dividends resulted solely from royalties derived from lessees of the property, that the Adams was not operating its property, and that there was no other possible source of income other than leasehold royalties. They also knew that, during all of this time, Nicholson was in control

of the actual operation of the property. So far as the lease (including extensions) was concerned, the existence of some such arrangement was known to these parties, and they made no attempts to further learn the terms and conditions thereof.

It is strenuously contended that neither complainants nor interveners knew, until in 1914, that neither the lease nor either of the extensions had been made without ratification at a regular stockholders' meeting. The only meetings of stockholders held subsequent to the making of this lease (1899) and before suit were annual meetings in 1902, 1911, 1912, and 1913, and a special meeting, in June, 1903, to renew the corporate charter. Notices of each of these meetings were sent to all stockholders, and were received by the parties hereto. It is not contended that there were any other meetings within this time. It cannot be contended that these parties had any reason to believe that other meetings had been held. In fact, what information they had would lead them to the contrary belief. No annual report had been made for some years after 1894, until in November, 1902. At that time a so-called report was made covering the period November 1, 1894, to September 30, 1902. A statement in this report was as follows:

"The last election was held in November, 1896. In the succeeding years had personal communication with a large majority of the stockholders, and as they exhibited indifference to holding an election, and failed to provide the necessary representation, I was advised by the board of directors and the stockholders referred to to hold over from year to year until other conditions prevailed. This year, however, I deem it best to order an election to be held the third Tuesday in November, to wit, November 20, 1902, then and there to elect seven directors. I trust our stockholders will realize the importance of it, by sending in the proxies promptly, as their action will be considered as an indorsement of my official career, and approval of all the acts herein set forth by this administration up to date."

At the meeting of 1902 George R. Elder was present and the stock of the other parties hereto was represented. At that meeting Elder made an unsuccessful attempt to gain representation on the board of directors and to oust Sylvester. During the year 1903, covered by the election at the meeting in 1902, three dividends, totaling $22,500, were paid. Thereafter royalties diminished so that until 1911, only three dividends were paid—one in 1904, totaling $7,500, one of the same amount in 1905, and one of $6,000 in 1909. The last dividend was from royalties slowly accumulated from a "clean-up" of the property, which no longer revealed paying ore. Up to December, 1910, the property had been, for practical purposes, a lead and silver mine. At that time the lessees discovered a considerable body of carbonate of zinc. Dividends were resumed in 1911, and continued beyond the filing of this action. With 1911 began again the regular annual meetings. No inquiry was ever made during this period, by any of these parties, as to whether other meetings of the stockholders had been held, or whether any action ratifying or attempting to ratify the lease, or any extensions, had been taken at any stockholders' meeting. Nor was there, during such time, any inquiry as to the terms or conditions under which the property was being operated. There was, during this period, considerable friction *within* the Adams Company between the Elder

and the Sylvester interests, but that friction did not concern the operation under lease, the validity of the lease and extensions, the terms of the same, or the integrity of the lessee in carrying out the lease. This friction related solely to the management of the Adams Company by Sylvester; the Elder interests claiming that such management was extravagant, if not dishonest, resulting in diminished dividends to the stockholders. The only friction between any stockholder and the lessee was the complaint of George R. Elder that Nicholson, who was then managing the operation for the corporation lessee, refused in 1900 or 1901 to longer furnish Elder with information concerning the output of and the royalties paid on the Adams property; the reason given by Nicholson being that Sylvester, then president of the Adams, had instructed him to give no further information to any one, but leave such information to come from Sylvester. Prior to this instruction from Sylvester, Nicholson had freely given Elder such information, and he expressed repeatedly his willingness to continue doing so, if Sylvester would consent.

When the Adams property again became a considerable producer, the Elder interests, under the active leadership of George R. Elder, much dissatisfied with the Sylvester management, renewed the contest for control of the Adams Company. This culminated in the annual meeting of the stockholders held in December, 1913. At that meeting Nicholson, who had become a stockholder in the Adams Company with a nominal holding, was elected chairman. The contest there for control pivoted around the proxies for certain shares. Both Elder and Sylvester claimed to hold the legal proxies for those shares. Nicholson ruled in all instances in favor of Sylvester, and his actions had much to do with the defeat of Elder. The first hint of any dissatisfaction with the lease, or any question as to its validity, occurred when George R. Elder, during the 1913 meeting, leaned over and said to Nicholson, "Sam, look out, or some of the stockholders will cancel your lease." The following year, after trying vainly, for the time being, to get possession of the Adams books and funds, and to exercise management over the affairs of that company, this action was filed.

We do not doubt that all of these parties knew, for years before the original lease expired, of its terms and duration, and that the dividends they were receiving came solely through operation thereunder. We are equally sure that all of them knew, from the time of expiration of the original lease and until this suit was brought, that the property was still being operated under lease by the same general interests and under the same personal (Nicholson) management. In the presence of this knowledge, and in the absence of all inquiry concerning the lease or the extensions, they cannot now found any rights upon any actual ignorance of the exact terms of that lease and those extensions. There is here no basis for a claim that such inquiry was prevented by any statement or action of the lessee. The truth is that they were all well satisfied to have some responsible party take over the operation of this property, which had gotten into a condition where the Adams Company, with its debt-burdened treasury, could do nothing.

Nor can any of them base a legal right upon the claim that they

were ignorant of the lack of ratification of this lease and the extensions. They received notices to all stockholder meetings. They were present at most of them, in person or by proxy. They cannot base a claim upon a presumption or possibility, in their minds, that meetings might have been held of which they had no notice, because neither were any such ever held, nor was there any attempt to cause them to believe or suspect that such had been held, nor did they make any inquiry thereabout; also, they cannot rely upon a surmise that, at the one meeting (1911), at which none of them were present, such ratification had occurred or been attempted, because no such thing occurred, nor were they led to so believe, nor did they make inquiry thereabout. They must be held to have known, or to have been put upon inquiry, concerning the existence of the lease and the extensions, and the absence of any ratification thereof by a regular stockholders' meeting.

It is true that they did not know that the Colorado statute (section 865, R. S. 1908), requiring ratification of "incumbrances" at a meeting of stockholders, included leases of this character. They thought it did not. But this erroneous belief was in no way induced or suggested by any one connected with appellees. Until the Westerlund Case, supra, it was the general belief in Colorado that leases were not covered by the statute. But there is no evidence that this misconception of legal rights in any way influenced any of appellants. For years they were pleased enough to have some one else undertake the risk and expense of exploration and operation hereunder, until valuable quantities of ore had been extracted and uncovered and until Nicholson joined active forces with their enemy, Sylvester, shortly after, or about the time, they became informed of the Westerlund case, decided early in 1913. It is contended that appellees were bound to know the law, in this regard, but that appellants could rest secure in their ignorance of such. We cannot concede this difference. Nor is this an instance of two parties contracting under a recognized mutual mistake of law.

Appellants contend that inaction upon their part to annul the lease and extensions was induced by the action of appellees in denying information, or in giving false information concerning the output of the Adams property. The individuals so intended are Nicholson and Sylvester. The evidence shows that Nicholson and his wife were very friendly wtih George R. Elder and his wife, and that Nicholson gave freely information asked by Elder until instructed not to do so by Sylvester. Nicholson was under no legal obligation to give Elder any information concerning the operations in the Adams property. The evidence is clear, however, that he willingly did so until Sylvester objected. It was natural that Nicholson should respect such an instruction, coming from the president of his lessor, and the controlling force thereof. Nicholson at all times expressed a willingness to give such information if Sylvester would permit. At no time did Nicholson give misleading information. As to Sylvester, the situation was that he and the Elder interests were bitter rivals for control of the Adams Company, and the Elders were sharply critical of his official acts. The evidence justifies them in such criticism at least in so far as it relates to payment of extravagant salaries to himself and a kinsman. That

Sylvester used his position as president to his own gain in this respect is clear. There is, however, no testimony of any other form of misapplication of funds.

The conduct of Sylvester in refusing Elder full information, at all times, concerning the general financial affairs of the company cannot be justified. But it had nothing whatever to do, in the minds of appellants, with the lease and extensions. They sought such information solely to protect themselves against the Sylvester management in the use of the funds arising from royalties under the lease, and never to question the lease or actions of the lessee thereunder. As to false statements concerning the condition of the property, the proof is otherwise. Some circulars and communications to the stockholders were gloomy, but so were the prospects of the property at such times. The evidence shows that the bulk of the value reflected in the dividends from this property during this period came from two uncertain and unexpected sources, to wit, a smelter method of utilizing certain ores, which were unmarketable when the lease was made, and an important discovery of unknown bodies of a kind of ore new to this mining district. We cannot say that the general tenor of these Sylvester communications or that any particular one or more of them evidence any purpose to deceive or would naturally have such an effect.

We must conclude that appellants had actual knowledge, or such information as to put them upon inquiry, of every essential fact. With such knowledge, appellants made no slightest move to question the validity of the lease or the extensions. On the contrary, they received and kept dividends which they knew came solely from the operations of the lessee. This they did for years before this action was brought, and the evidence discloses such acceptance of dividends even after suit. They have received and kept every benefit from the lease. This they did with full knowledge that the lessee was expending thousands of dollars in the operation and exploration of the property. They cannot knowingly let the lessee take the risks of an uncertain mining adventure under a lease, take and keep the results of his risk, effort, and expenditure, and then deny the lease. If they desired to challenge the lease, they should not have recognized it by accepting its fruits, but they should have evidenced their intention to attack it. This should have been done promptly, for the uncertainties and risks of mining are too great and too immediate to permit one to sit by until the outcome of the venture is made certain. Patterson v. Hewitt, 195 U. S. 309, 321, 25 Sup. Ct. 35, 49 L. Ed. 214; Sturm v. Wiess (C. C. A.) 273 Fed. 457.

We approve the finding of the master and of the trial judge that appellants are estopped by their conduct from questioning the lease or the extensions here involved. This determination makes it unnecessary to examine the other points presented on the main appeal.

[2] George R. Elder and Ida D. Elder, his wife, sought to intervene. They appeal from an order of denial by the trial court. In this court, these appellants, as well as the appellants in the main case, have joined in a petition for an order permitting the interveners "to adopt as their transcript of record the transcript of record filed by the com-

plainants." In the printed brief appellants state that this petition is "to the end that the cause may proceed here upon the merits substantially as though the interveners had been permitted to join as parties complainant prior to the entry of the final decree below," and also "to the end that useless delay and expense may be eliminated and a just result attained without further and totally unnecessary proceedings before the court below." They also state that "the said interveners were both examined and exhaustively cross-examined at the trial, and it seems that there is no legal or equitable reason for their postponement to the futility of separate proceedings in the court below." The court below denied the intervention on the theory that to permit such would oust the court of jurisdiction because of the citizenship of the interveners. We think this reason unfounded. Supreme Tribe of Ben Hur v. Cauble, 255 U. S. 356, 41 Sup. Ct. 338, 65 L. Ed. 673.

[3] Without determining whether an order denying an intervention of this character is an appealable order, we think best to treat the matter in a practical way, and therefore consider the petition referred to above. The petition is unique in character, and the maintenance thereof is at least doubtful. However, the issues presented by the intervention are precisely the same as in the main case; the interveners and the complainants have not only the same legal interests, but all are controlled by the same facts, and all of those facts appear fully in this record. Thus no possible injustice or disadvantage to appellees could follow our granting the prayer of this petition. Besides, it seems a sensible, practical determination of the matter. The petition is therefore granted, and the rights of interveners considered as though they had been made parties complainant before final judgment below. Their rights, so considered, in no wise differ from those of complainants as above set forth. In fact, if there is any difference, the reasons apply more strongly to the interveners than to the complainants, for George R. Elder and his wife, Ida D. Elder, lived in Leadville, during the period here involved, almost in sight of where this property was being operated; both knew Nicholson and his wife intimately, and George R. Elder was not only a lawyer, but a mine owner and operator of years of experience in the Leadville district.

The order, therefore, will be that the petition of interveners be granted, that they be treated in this court as parties complainant below (appellants here), that the decree below, as to complainants, be affirmed, and that such affirmance include interveners as well.