## M. WITMARK & SONS v. FRED FISHER MUSIC CO., Inc., et al.

### No. 123.

Circuit Court of Appeals, Second Circuit.

Feb. 11, 1942.

Stuart H. Aarons, of New York City (R. W. Perkins, of New York City, on the brief), for plaintiff-appellee.

John Schulman, of New York City (Hays, St. John, Abramson & Schulman and Milton Sargoy, all of New York City, on the brief), for defendants-appellants.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

We are presented with a question of statutory construction which has apparently never arisen before, though the general statutory provision has existed for over a hundred years. Simply stated, the problem is whether or not a copyright holder may assign his expectancy of the renewal right which arises under 17 U.S.C.A. § 23 at the expiration of the original twenty-eight year copyright grant. The district court upheld the validity of the assignment. 38

F.Supp. 72. This was in accordance with a strong dictum of this court in the case of Tobani v. Carl Fischer, Inc., 2 Cir., 98 F. 2d 57, 60, certiorari denied 305 U.S. 650, 59 S.Ct. 243, 83 L.Ed. 420. We think it interpreted the law correctly.

The question arose in connection with the renewal of the copyright on the song "When Irish Eyes Are Smiling." One of the defendants, George Graff, Jr., collaborated in the writing of this song in 1912, at which time he was acting under a general agreement to assign all copyrights to the plaintiff, M. Witmark & Sons, with a reservation of royalties. Five years later, Graff has stated, he was in financial difficulties; at any rate he then entered into a second agreement with the plaintiff by which for the consideration of $1,600 he released all his royalties on some sixty-nine songs, including "When Irish Eyes Are Smiling," and also made a further assignment of the renewal rights. This further assignment purported to bind Graff and his "heirs, executors, administrators and next of kin," and granted an irrevocable power of attorney to plaintiff to execute in Graff's name or that of his heirs, etc., all documents necessary to secure the renewal of the copyright and all rights therein for the term of the renewal. That is, the assignment was supported by the traditional power of attorney to enforce its terms, which has historically been the bridge whereby assignments anciently not recognized "at law" were actually made effective according to the intent of the parties. Cook, The Alienability of Choses in Action, 29 Harv.L.Rev. 816, 822, 824; Ames, Lectures on Legal History, 213, 214; 34 Yale L.J. 409; In re Barnett, 2 Cir., 124 F. 2d 1005, 1008. This agreement, dated May 19, 1917, was duly recorded in the Copyright Office on November 19, 1935.

On August 12, 1939, the first day of the twenty-eighth year of the copyright in question—renewals must be applied for within that year—plaintiff entered an application for renewal in Graff's name, registered the renewal in Graff's name, assigned the renewal copyright to itself, and recorded the assignment. Eleven days later Graff applied for his renewal and assigned this renewal to defendant Fred Fisher Music Co.[1] When Fisher threatened to publish the song, the plaintiff instituted this action asking for an injunction, accounting, and damages, and moved for an injunction pendente lite. On the grounds that the assignment was valid, the motion was granted below and this appeal followed.

We start with the statute. It says that "the author * * * if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright * * * for a further term of twenty-eight years when application for such renewal and extension shall have been made * * * within one year prior to the expiration of the original term of copyright." 17 U.S.C.A. § 23. It is conceded by all concerned that this creates only an expectancy, and that in any event the author must be alive on the first day of the twenty-eighth year in order to obtain a renewal. An assignment of this expectancy likewise must rest also on survival. It is also apparent that the assignment here would not have cut off the rights of renewal extended to the widow, children, executors, or next of kin, in the event of Graff's death prior to the renewal period. See Fox Film Corp. v. Knowles, 261 U.S. 326, 43 S.Ct. 365, 67 L.Ed. 680. The only contested point is whether or not the statute absolutely forbids assignment. Certainly the passage does not say it does. There are no words that an assignment "shall be void and of no effect," as, for example, in 38 U.S. C.A. § 129, dealing with the pledge or transfer of a pension. If we had no more than the words of the statute to go on, we could hardly find in that a restraint on freedom of assignment.

Reliance is had, however, upon the statutory history. The Copyright Act of 1790 said that the "exclusive right shall be continued to [the author] * * * executors, administrators or assigns." 1 Stat. 124. In 1831, the Act was amended; and in changing the renewal provision to approximately its present form, the words "executors, administrators or assigns" dropped out. 4 Stat. 436. This, we are told, indi-

---

[1] It should be noted that Chauncey Olcott and Ernest Ball, who collaborated with Graff, died before the renewal period. Olcott's widow assigned her renewal to the plaintiff; Ball's widow assigned hers to defendant Mills Music, Inc. Since Mills does not threaten to publish the song, the injunction does not run against it.

cates that assignments are not tolerated.[2] But it may just as well be argued that the statute sought only to prevent an assignment that would cut off the widow's and children's rights in case the author died; or that Congress intended only the author and his family to be able to get a renewal, and thus "executors, administrators" went out along with "or assigns"; or, as said in White-Smith Music Pub. Co. v. Goff, 1 Cir., 187 F. 247, 250, that Congress enacted "an entirely new policy, completely dissevering the title, breaking up the continuance in a proper sense of the word, whatever terms might be used, and vesting an absolutely new title eo nomine in the persons designated." All that this says, however, is that assignment of copyright is not assignment of renewal; that renewal is an expectancy, not a present right. It does not express a public policy against disposal of the possibility of renewal. We cannot find a policy of "void and of no effect" in this change. Nor do the Goff case and others like it express such a policy. At most they indicate that an assignment would have to be like the one in this case to be effective. And since the issue was not present in those cases, it was not passed upon. See Fox Film Corp. v. Knowles, supra; Silverman v. Sunrise Pictures Corp., 2 Cir., 273 F. 909, 19 A.L.R. 289, certiorari denied 262 U.S. 758, 43 S.Ct. 705, 67 L.Ed. 1219.

More to the point is the Congressional Report on the Act of March 4, 1909, which is the present statute, 17 U.S.C.A. § 23—except for a slight textual change of 1940, here immaterial. The committee was supporting the decision to extend the right of renewal another fourteen years to make a total renewal period of twenty-eight years, and it stated its preference for this arrangement, rather than a single and longer term as for life or fifty years. So it said:

"Your committee, after full consideration, decided that it was distinctly to the advantage of the author to preserve the renewal period. It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right.

"The present term of twenty-eight years, with the right of renewal for fourteen years, in many cases is insufficient. The terms, taken together, ought to be long enough to give the author the exclusive right to his work for such a period that there would be no probability of its being taken away from him in his old age, when, perhaps, he needs it the most." H.R.Rep. No. 2220, 60th Cong., 2d Sess., p. 14. The House Report was adopted by the Senate Committee on Patents as its own. Sen.Rep. No. 1108, 60th Cong., 2d Sess.

We think it fair to say that defendants' case substantially depends on this quotation, as expressing a clear intent as to the statutory meaning and one to which we should give effect. But several observations must be made about it, for it contains its own ambiguities. Its direct purpose was clearly to explain the *continuance* of a renewal term as against the substitution of a single long term. In other words, it argued for an existing arrangement—"the existing law"—and so not necessarily or clearly for an absolute prohibition. If the committee had really meant the latter, they could easily have so drafted the statute. And they could easily have stated their purpose in unambiguous words in their report. As it is, their own words are almost as ambiguous as the statute itself. They said the author "could not be deprived of" the right to renew. Does this mean he could not be deprived of it if he "sells his copyright outright to a publisher"?[3] If so, we agree. Or did they mean that a court was to strike

---

[2] In Paige v. Banks, 13 Wall. 608, 20 L.Ed. 709, the Court upheld an assignment made in 1828, as a transfer of a right of renewal after and under the Act of 1831. Assignment of the contingent right of renewal was upheld under the English statute, 8 Anne, c. 19, 1709. Carman v. Bowles, 2 Bro. C. C. 80, 29 Eng. Rep. 45, 1786.

We see little that illuminates our present issue in the Committee Report on the 1831 Act. Register of Debates, vol. 7, App. cxix.

[3] One treatise on copyright states that publishers sought unsuccessfully to induce the committee to include an amendment requiring author and assignee publisher to unite in renewal, thus preserving a publisher's investment in plates. Bowker, Copyright, 1912, 117. This establishes nothing more than the committee report does. Publishers are still dependent on the author's survival. Probably they would have liked to secure more than a precarious expectancy;

down the author's attempt specifically to dispose of his expectancy? If so, "deprive" was a poor word to use, for the result is that he is "deprived" of his privilege to alienate his renewal right, not saved from "deprivation" of the right itself. As for the statement about the "probability of its being taken away from him in his old age," this is no more than a repetition of the same thought, and suffers from the same ambiguity.

If we could find that the statute had been interpreted—in the light of the committee's report—to forbid such assignments as we find here, we might well be inclined to give the committee the benefit of any doubts as to the language they had chosen. Meaning is frequently obscure, and courts may well be sympathetic to clear Congressional statements of what they think they are doing. United States v. Dickerson, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356; Hamilton and Braden, The Special Competence of the Supreme Court, 50 Yale L.J. 1319, 1357-1367; cf. Radin, Statutory Interpretation, 43 Harv.L.Rev. 863. But we do not find such interpretation; so far as we can ascertain, the general view has been to the contrary. Soon after passage of the Act, Assistant Attorney General Fowler observed that "no doubt it [the renewal] may be the subject of a valid contract before renewal, which would carry the equitable, if not the legal, title thereto when renewed." 28 Op.Atty. Gen. 162, 169. Such also appears to have been the attitude of the people affected by copyright law as manifested in the treatises on the subject. Four treatises published before 1909 are definite in stating that an author may validly assign his expectancy of renewal,[4] and none that we have found deny it. After 1909, it is true that some of the experts tended to hedge. Four treatises published after the new act went into effect state that probably an assignment can be enforced;[5] but three others are fairly definite about it.[6] Only one of those we have found seems to deny assignability.[7] Of particular

interest is Wittenberg's treatise on Literary Property cited in the footnote. He purports to set out model contracts to be used by authors and publishers, and by authors and motion picture producers for movie rights. In the publishing contract, he admonishes the author to retain the copyright in his own name and grant only an exclusive right. But Wittenberg also insists that a provision be included whereby an author agrees to obtain a renewal and to assign the exclusive right under the renewal. This, he says, is because "the right to renew copyright * * * rests with the author, and he should agree to renew for the joint protection of himself and the publisher." Wittenberg, 195, 196. A similar clause is contained in the model movie rights contract. Id. 261.

Here, then, is a substantial number of writers on the subject all tending to say the same thing: that only an author can renew, but that he can make binding agreements to renew for someone's benefit. It seems not unreasonable to conclude from this that such a belief doubtless exists throughout the trade. Naturally, neither this belief, if it exists, nor the authorities themselves in any way bind us. Yet some weight may be attached to the fact that an ambiguous statutory provision has fairly uniformly been interpreted one way, and presumably acted upon.

Perhaps even more persuasive is the history of further attempts to amend the copyright laws. The attempts were aimed at general revision, usually including a change in the duration of the copyright; but for our purposes only the provisions relative to the preservation of the status of copyrights existing at what would be the time of enactment of these bills are of interest.

In two bills we find this passage: "Provided, that where the author has * * * agreed to part therewith for the renewal term under said act" [with terms following to make the renewal contract fit the time periods of the proposed act]. H.R. 6990, 71st Cong., 2d Sess.; H.R. 10434, 69th Cong.,

that they were unsuccessful does not show that even that was taken away.

[4] Drone, The Law of Property, 1879, 326, 332; MacGillivray, The Law of Copyright, 1902, 267; 2 Morgan, The Law of Literature, 1875, 230; Curtis, The Law of Copyright, 1847, 235.

[5] Marchetti, Law of the Stage, Screen and Radio, 1936, 67; DeWolf, Outline of Copyright Law, 1925, 66; Weil, Copyright Law, 1917, 367; Bowker, Copyright, 1912, 117.

[6] 2 Ladas, International Protection of Literary and Artistic Property, 1938, 773; Wittenberg, Literary Property, 1937, 45; Frohlich & Schwartz, The Law of Motion Pictures, 1918, 549.

[7] Amdur, Copyright Law and Practice, 1936, 532-538, 540-541. His long discussion is unilluminating, however, for he appears not to have considered any problem but that of the assignee's renewing in his own name.

1st Sess. And in two others this provision appears: "where * * * the author has agreed to renew the copyright for the renewal term for the benefit of the assignee or licensee" [with similar terms following]. H.R. 11948, 72d Cong., 1st Sess.; H.R. 10976, 72d Cong., 1st Sess. Still a fifth bill, which passed the House, says much the same thing in only slightly different words. H.R. 12549, 71st Cong., 3d Sess.[8] This, we conceive, constitutes a recognition, on the part of the drafters at least, of the validity under the 1909 Act of assignment of expectancies.[9] A somewhat more direct acknowledgment of the validity of assignments is found in three other bills. These provide that the continuation of the copyright beyond twenty-eight years shall vest "in the person or persons * * * who would have been entitled to the renewal term * * * subject to any agreement valid in law or equity, which may have been made for the disposal of the renewal term prior to the date when this section, as amended, takes effect." H.R. 926, 76th Cong., 1st Sess.; H.R. 5275, 75th Cong., 1st Sess.; S. 2240, 75th Cong., 1st Sess.[10] All told, those Congressmen interested in copyright law seem to have taken it for granted that an author could agree to assign the renewal to someone. If they went that far, undoubtedly they would agree that an author could authorize someone to act in his name when the renewal period arrived.

Notwithstanding this history, we might well be moved by a demonstration that only by holding all assignments void could we further the policy of the act. But even this seems to us quite doubtful. True, it would be nice for an author to look forward to more money when the renewal time comes. But he can do that by not assigning. What we would be saying is that all authors who have already assigned can eat their cake and have it too. Only in the future would such a ruling be fair all around. Furthermore, it is not clear that authors wish to be deprived of the privilege of obtaining more money now, or that a widow whose husband dies penniless wishes to be deprived of the privilege of anticipating on her statutory renewal right. We are, in effect, asked to impose forced saving on authors and widows by requiring them to forego for twenty-eight years whatever additional money they could obtain by assignment of their expectancies. It should require more than an ambiguous committee report on an ambiguous statutory provision to produce such a drastic restriction on free assignability.

This conclusion is reinforced by the history of judicial disapproval of restraints on assignability. Thus lawyers discovered a way around the archaic rule against assignment of choses in action, courts of equity supported them directly, and courts of law winked at the result. Cook, op. cit. supra. Equally familiar are the general rules against restraints on alienation of property.[11] There may be mentioned, also, the unsuccessful attempts of employers to prevent wage assign-

---

[8] The committee report on this bill appears to recognize assignments, for it speaks of retaining the "absolute reversion" of renewal—to "parallel" that of the 1909 Act—in the author's representatives, "regardless of his assignments." H.R.Rep. No. 1689, 71st Cong., 2d Sess., p. 10.

[9] We may point out that the terms provided for in the bills were: (1) if the original copyright assignment was on a royalty basis, the same royalty was to be paid during the renewal period; (2) if the original copyright had been sold for a lump sum, two bills said the same sum should be paid again, and two bills said "the author and/or the owner shall be entitled to the [renewal], upon performance of such conditions as may be determined by agreement, or in the absence of an agreement * * * by the court, as justice may require." That Graff would probably have obtained a further payment from the plaintiff had any of these bills passed is immaterial so far as the present discussion is concerned.

[10] It is worth mentioning that the quoted section appears to be inconsistent with an earlier section which seems to deny the validity of such agreements. Compare § 24 with § 23, H.R. 926, supra. The explanation seems to be that § 23 referred only to unpublished works.

[11] Carey and Schuyler, Illinois Law of Future Interests, 1941, c. 13, esp. §§ 421, 434, 439; Schnebly, Restraints Upon the Alienation of Legal Interests, 44 Yale L.J. 961–995, 1186–1215. Schnebly says (at 961): "Indeed, a substantial portion of the history of real property law consists in the record of various legal devices whereby it was sought to make land inalienable, and of the means whereby the courts thwarted those efforts in order to protect what they deemed to be the larger social good." See, also, Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 404, 31 S.Ct. 376, 55 L.Ed. 502, 517; Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086.

954

ments, and the consequent specific legislation forbidding or regulating such assignments. One such statute was even declared unconstitutional. Massie v. Cessna, 239 Ill. 352, 88 N.E. 152, 28 L.R.A.,N.S., 1108, 130 Am.St.Rep. 234; see, generally, Fortas, Wage Assignments in Chicago, 42 Yale L. J. 526. And there is the unusual case of an unenforceable assignment of an interest under a spendthrift trust being enforced by the pleasant fiction of calling it a "contract to assign," with the amount assigned as the measure of damages. Kelly v. Kelly, 11 Cal.2d 356, 79 P.2d 1059, 1064, 119 A.L.R. 71; 48 Yale L.J. 666. Further, there is our own recent holding that an assignment of an expectancy under a will is valid, In re Barnett, supra; 3 Restatement, Property, § 316; and so generally of contingent interests in modern law, 2 Restatement, Property, § 162. Our society still rests on the theory that men can ordinarily make free disposition of their property rights. We are perfectly willing to uphold a Congressional declaration that public policy forbids assignment of a copyright renewal; but we expect something more than ambiguous inferences drawn from a committee report explicitly arguing only for continuance of an existing statutory scheme with a new renewal period. If property rights are to be rendered immediately untranslatable into money or money's worth, in order to protect remote and contingent future gains, that result should be accomplished by legislative declaration, not by judicial fiat.

■ We are limiting our discussion, as did the parties before us, to the question of statutory interpretation. On this interlocutory issue we ought not to foreclose other contentions which the parties may wish and be entitled to raise on the merits, including possibly claims of inadequacy of consideration *in 1917,* so gross as to prevent negative enforcement of the assignment, with which would go the question of adequacy of damages as a remedy for breach. 2 Restatement, Contracts, §§ 358, 363, 367, 380. But we think we should say that the record contains no

evidence which casts doubt on the consideration; certainly defendant Graff's statement that royalties on the songs covered by the assignment had amounted to as much as $5,000 annually (i.e., as a maximum) does not do so, particularly in view of the well-known ephemeral nature of popular song hits. Indeed, defendants base their assertion of the song's present value on the new developments of radio, electrical transcription, and sound motion pictures. And their advertising adds that sung by Olcott "for a year or two and then having lived its hour it seemed destined to be forgotten" until "a Dublin minstrel," returning "to his native isle," made it part of "the folk lore of Ireland," whence it came back here to a seemingly delayed, albeit considerable, present success.

Affirmed.

FRANK, Circuit Judge (dissenting).

1. From most interlocutory orders there is no appeal. From an interlocutory injunction, because of its marked capacity for harm, Congress permits an appeal. Unusual caution should be exercised in the issuance of such an order. Cf. Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416. In the case at bar, the preliminary injunction seriously intrudes on defendants, restraining them from continuing sales—which had been going on for about a year—of the copyrighted song and adversely affecting their good will. That order was improper if, on the facts presented, assuming, for present purposes, that they will be the facts on final hearing, it seems unlikely that plaintiff will be granted the final relief sought, a decree for specific performance.[1] I think the order should be reversed, because on the facts as they now appear, a court of equity should not grant specific performance, in the light of the subject matter of the contract, the circumstances and relations of the parties when it was made, and the consideration paid.

In 1917, when the contract was made, the plaintiff was a successful publisher, and

[1] The district court [38 F.Supp. 72, 76] said in its opinion: "Some question may be raised that although plaintiff has the right to the renewal copyright, the procedure of obtaining the renewal herein is defective. However, there appears to me to be no material advantage gained in forcing plaintiff to bring an action for specific performance, or for a declaration of trust in the author, for the benefit of plaintiff."

Plaintiff in its brief relied on G. Schirmer, Inc., v. Robbins Music Corp., 1941, 176 Misc. 578, 28 N.Y.S.2d 699 which, said plaintiff, "accepted the decision of the court below as controlling upon the State Court in decreeing specific performance of a similar contract."

the defendant Graff, an author or lyricist. It is admitted on this record that Graff was then "in desperate financial straits." By that agreement, Graff (a) released plaintiff from the obligation, existing under an earlier agreement, to pay to defendant, over a considerable future period, annual royalties, on a group of some seventy songs, which royalties "had amounted in previous years to as much as $5000 annually"; and (b) contracted to give plaintiff his personal contingent rights to renew the copyrights on those seventy songs, if ever those rights should later ripen, i.e., if Graff should live twenty-two years longer, until 1939. The consideration was a lump payment to Graff of $1,600. The released royalties alone were almost certain, in a short period, to equal the entire consideration of $1,600; on that basis, nothing was actually received for the renewal rights. But even if we assume that nothing was paid for the released royalties and the entire $1,600 was paid for the renewal rights, then, as there were seventy songs, the amount paid for the renewal right to the particular song involved in this suit was one-seventieth of $1,600 or about $23. The right to renew a copyright twenty-two years later—a right which on no assumption could have any worth to the purchaser unless the author lived for twenty-two years more—was, of course, highly speculative. The speculation has proved immensely valuable for the plaintiff.[2]

In considering those facts, we should take judicial notice of the economic capacities and business acumen of most authors. In ascertaining that certain persons, because "often under economic compulsion," constituted a "necessitous class," our present Chief Justice, in 1928, used, judicially, off-the-record knowledge which no casual inquiry would elicit—such as the contents of a report by the City Club of New York, of the Proceedings of the Association of Governmental Labor Officials, and the like.[3] We need not go nearly so far here. We need only take judicial notice of that which every schoolboy knows—that, usually, with a few notable exceptions (such as W. Shakespeare and G. B. Shaw), authors are hopelessly inept in business transactions and that lyricists, like the defendant Graff, often sell their songs "for a song."

Here, then, is a case where (a) the defendant was an author, one of a class of persons notoriously inexperienced in business, and the particular author was actually, at the time, in desperate financial straits, while the plaintiff was a successful and experienced publisher; (b) the property contracted for was of such a character that, when the contract was made, "neither party could know even approximately the value," so that "it was

---

[2] The present value of the renewal right to the song in suit is not estimated in the moving papers. However, it was used 6,335 times on the radio in 1939, and there are a number of prospective profitable uses which have come into being since the date of the assignment, such as electrical transcriptions for radio, motion-picture sound tracks, coin-operated public phonographs and radio broadcasting. In its moving paper, appellee's president urges that the song "is one of the most celebrated ballads of our times," and that an injunction is necessary to prevent "substantial monetary damage."

There were similar renewal rights to several other songs sold by Graff to the plaintiff in the same contract—including the well-known 'Till The Sands of the Deserts Grow Cold—which have admittedly "become world famous."

[3] Dissenting opinion in Ribnik v. McBride, 1928, 277 U.S. 350, 361, 364–370, 48 S.Ct. 545, 72 L.Ed. 913, 56 A.L.R. 1327. That dissent is now good doctrine in the light of Olsen v. Nebraska, 1941, 313 U.S. 236, 244–246, 61 S.Ct. 862, 85 L.Ed. 1305, 133 A.L.R. 500.

Mr. Justice Brandeis confessedly went out of the record to acquaint himself, judicially, with "the art of breadmaking and the usages of the trade, with devices by which buyers of bread are imposed upon and honest bakers or dealers are subjected by their dishonest fellows to unfair competition, with the problems which have confronted public officials charged with the enforcement of the laws prohibiting short weights, and with their experience in administering those laws" —obtaining such information from a variety of sources, including a letter, written in 1917, by Herbert Hoover to President Wilson; Jay Burns Baking Co. v. Bryan, 1924, 264 U.S. 504, 517, 533, 44 S.Ct. 412, 416, 68 L.Ed. 813, 32 A.L.R. 661. Cf. Oklahoma v. Guy F. Atkinson Co., 1941, 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487.

For these and related matters, see Davis, An Approach to Problems of Evidence in The Administrative Process, 54 Harv.L.Rev. (1942) 364, 403–405.

a bargain made in the dark"; and (c) the consideration was a very small sum.

That is not the kind of contract which equity will specifically enforce. Although Chancellor Kent, in a well-reasoned early case, Seymour v. Delancey, 6 Johns.Ch., N.Y., 222, concluded that inadequacy of consideration alone would bar specific performance of a contract, his views were rejected on appeal by a bare majority, 3 Cow., N. Y., 445, 15 Am.Dec. 270, in what became the leading American case. More recently, however, there has been a growing tendency to adopt Chancellor Kent's view. But we need not rely on such authorities, for it is well-established that specific performance will be denied where, in addition to inadequate consideration, other factors contribute to the inequity of the bargain. See 2 Chafee and Simpson, Cases on Equity (1934) 1173-1193, especially note 5, page 1185. Among the factors to be considered are lack of advice by one contracting party, Ames v. Ames, 46 Ind.App. 597, 91 N.E. 509; Banaghan v. Malaney, 200 Mass. 46, 85 N.E. 839; 19 L.R.A.,N.S., 871, 128 Am.St.Rep. 378; differences in business experience or information, Margraf v. Muir, 57 N.Y. 155; especially if an improvident contract is the result, Pickett v. Comstock, 209 Iowa 968, 229 N.W. 249.[3a] Where a small lump sum consideration is coupled with the sale by an inexperienced seller of property highly problematic in value, equity will deny relief. Marks v. Gates, 9 Cir., 154 F. 481, 14 L.R.A.,N.S., 317, 12 Ann.Cas. 120; cf. Federal Oil Co. v. Western Oil Co., 7 Cir., 121 F. 674; and cases cited in 58 C.J. 954-957; Pomeroy, Specific Performance of Contracts, 3d Ed. 1926, Sections 192-198. In Marks v. Gates, supra, the plaintiff asked for specific performance of a contract by which the defendant agreed to convey to him a twenty per cent interest in any property he should acquire in the Territory of Alaska. The consideration was $1000 in cash, and the cancellation of a debt of $11,225. Within two years, the defendant had acquired cer-

tain mining properties, worth more than $750,000. In denying specific performance, the Circuit Court of Appeals [154 F. 483] for the Ninth Circuit said that the contract bound the defendant to convey "property of which neither party could know even approximately the value. It was a bargain made in the dark. * * * Where the consideration is so grossly inadequate as it is in the present case, and the contract is made without any knowledge at the time of its making on the part of either of the parties thereto of the nature of the property to be affected thereby, or of its value, no equitable principle is violated if specific performance is denied, and the parties are left to their legal remedies, if any they have."

For the foregoing reasons, the order for an interlocutory injunction should be reversed.[4]

2. It should also be reversed because there can, I think, be no enforcement, under the Copyright Act of 1909, of a contract for the sale of an author's renewal option if made prior to the date when the author is himself able to exercise that option.

My previous discussion has a bearing on the interpretation of that Act. For, as the equitable policy of denying enforcement of certain contracts for the sale of property, which I have just considered, rests upon non-statutory grounds, it serves to answer my colleagues' suggestion that, we must take it for granted that the policy of our legal system is steadfastly opposed to any impediments on the freest possible alienability by all men of their property, and that we must construe this statute accordingly.

As one might surmise, Congress had fully in mind the inexperience of authors. As I shall show, it desired to protect them against the very sort of improvident agreement for the disposition of their contingent renewal privileges which, in the case at bar, the majority opinion holds to be enforceable. Indeed, my colleagues, a few weeks ago, joined in an opinion in

---

3a Cf. Mississippi & Mo. R. R. Co. v. Cromwell, 91 U.S. 643, 645-646, 23 L. Ed. 367; Randolph's Ex'r v. Quidnick Co., 135 U.S. 457, 459, 10 S.Ct. 655, 34 L.Ed. 200.

4 The defendants seem not to be financially responsible. That alone, however, is no ground for a preliminary injunction, and surely not when there are other means of protecting plaintiff, should it

ultimately win, without doing unnecessary harm to defendants should they ultimately succeed. At most (assuming that any agreement made prior to the renewal date to sell a renewal right can be valid) the interim order should not have gone beyond an impounding, pendente lite, of the receipts of defendants from sales of the song.

which it was said (in passing, to be sure) that the very section of the Act now before us "imposes [a limitation] upon the author's power to dispose of the right of renewal during his life" which was "clearly intended to protect widows and children from the supposed improvidence of authors * * *¹" Shapiro, Bernstein & Co., Inc., v. Bryan et al., 2 Cir., December 1, 1941, 123 F.2d 697, 700. [Incidentally, that recent decision makes it unnecessary to give any weight to the obiter dictum in the opinion of Manton, J., in Tobani v. Carl Fischer, Inc., 2 Cir., 98 F.2d 57, 60, to which the majority opinion in the instant case refers with approval.]

The majority opinion grants, as it must, that Congress put some very real restraints on the author's power to dispose of his statutory renewal option: One who purchases it under a contract made prior to the renewal date acquires nothing, even the majority concedes, if the author is not alive on that date; if he dies intestate before then, his creditors cannot avail themselves of that option on the renewal date, even if he leaves no widow or children, because Congress expressly said that the option should then pass to his next of kin and not to his administrator. And the majority admits, also, that the statute does not clearly provide that if the author is alive on the renewal date, the option passes to a purchaser under such a contract as is before us in the instant case. We must, therefore, turn to the legislative history.

My colleagues quote a part of the Congressional committee reports concerning the 1909 Act. Those reports in discussing the author's right to a renewal term, say that "the law should be framed as is the existing law, so that he could not be deprived of that right," and cannot have it "taken away from him in his old age when he needs it the most." Since the 1909 report refers to the then "existing law," the 1831 Act, we should examine—as the majority does not—the following comments of the Congressional Committee made at the time when the 1831 Act was enacted:

"At the second session of the first Congress, a statute was passed to secure to authors the copy-right of their books, charts and maps. In 1802, a like statute was passed to secure the copy-right of prints [2 Stat. 171]. In both of these statutes, there are provisions which are useless and burdensome, and in which there are likewise discrepancies. * * * In the United States, by the existing laws, a copy-right is secured to the author, in the first instance, for fourteen years; and if, at the end of the period, he be living, then for fourteen years more; but, if he be then not living, then the copy-right is determined although, by the very event of the death of the author, his family stand in more need of the only means of subsistence ordinarily left to them. * * *

"The bill secures to the author a copy-right for twenty-eight years, in the first instance, with a right of renewal for fourteen more, if, at the end of the first period, the author be living, or shall have a family. * * * The scholar, who secludes himself and wastes his life, and often his property to enlighten the world, has the best right to the profits of those labors. * * * Shall we not encourage the means of that knowledge, and enlighten that virtue * * *? We ought to present every reasonable inducement to influence men to consecrate their talents. * * * It cannot be for the interest or honor of our country that intellectual labor should be depreciated, and a life devoted to research and laborious study terminate in disappointment and poverty. * * * The question is, whether the author or bookseller shall reap the reward."

With that Congressional purpose as to the 1831 Act in mind, we can the better get at the Congressional intention in enacting the 1909 Act by quoting (more extensively than do my colleagues) from the Committee Reports on that Act:[5]

"It was urged before the committee that it would be better to have a single term without any right of renewal, and a term of life and fifty years was suggested. Your committee, after full consideration, decided that it was distinctly to the advantage of the author to preserve the renewal period. It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and

---

[5] House Report No. 2220, 60th Cong. 2d Sess. p. 14 et seq. The Senate Committee adopted this report.

the law should be framed as is the existing law, so that he could not be deprived of that right. The present term of twenty-eight years, with the right of renewal for fourteen years, in many cases is insufficient. The terms, taken together, ought to be long enough to give the author the exclusive right to his work for such a period that there would be no probability of its being taken away from him in his old age, when, perhaps, he needs it the most. A very small percentage of the copyrights are ever renewed. All use of them ceases in most cases long before the expiration of twenty-eight years. In the comparatively few cases where the work survives the original term, the author ought to be given an adequate renewal term."[6]

We should, in the case before us, carefully consider especially these sentences from those two Reports: "The question is whether the author or bookseller should reap the reward." "It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum." Surely, in the light of the Congressional purpose thus disclosed, we ought not so construe the statute that the publisher and not the author will "reap the reward," when, as here—and as "not infrequently happens" —the "author sells his copyright outright for a comparatively small sum."

The Committees almost literally described the facts of the instant case: Graff sold outright his original term for a small sum. His turned out to be one "of the comparatively few cases where the work survives the original term." It was to meet just such a contingency, the Committees said, that Congress gave "the author the exclusive right" to "an adequate renewal term" so that he could, in such a case, "reap the reward" in "his old age." We should see to it, that, as Congress intended the "right of the author to take the renewal term" is so hedged about

that he can "not be deprived of that right" by having it "taken away from him in his old age when he needs it the most."

I find it difficult to regard those expressions of the Committees as mere idle talk, or as so ambiguous that we can laugh them off. The considerations which they present fully answer the suggestion in the majority opinion that, if we do not allow the author to contract away his contingent renewal privilege before it ripens, we may be depriving him of a means of procuring funds, by a sale of that right when it is still contingent on his living, i.e., prior to the beginning of the twenty-eighth year. If Congress intended him to be able to dispose of it before that time, why did it not confer on him a single fifty-six year term? Why did it provide for a renewal, and explicitly prevent its exercise at an earlier date? Plainly, as Congress said, because it wanted the author to be unable to sell it "outright to a publisher for a comparatively small sum"— as he endeavored to do in this very case. Here the attempted "outright" sale of the renewal right occurred in 1917, twenty-two years before the right came into existence (i. e., 1939). If Congress contemplated that the author should be able to make such a sale at so early a date, then it put him in the worst possible position to do so for an adequate consideration: As any Congressman with any sense must have seen, the sale value prior to the twenty-eighth year, 1939, would be small, because the purchaser would be buying a gamble on the author's longevity. In other words, to repeat, if such an early sale was to be allowed, the best arrangement for the author would have been a single term of fifty-six years, for then the gambling element would not inhere in the sale. But Congress explicitly rejected that arrangement. Why? In order, the Committees said, to safeguard the author "in his old age." That explicit intention is frustrated by the majority's interpretation.

[6] The report also said: "Your committee do not favor and the bill does not provide for any extension of the original term of twenty-eight years, but it does provide for an extension of the renewal term from fourteen years to twenty-eight years; and it makes some change in existing law as to those who may apply for the renewal. Instead of confirming the right of renewal to the author, if still living, or to the widow or children of the author, if he be dead, we provide that the author of such work, if still living, may apply for the renewal, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower or children be not living, then the author's executors, or, in the absence of a will, his next of kin. It was not the intention to permit the administrator to apply for the renewal, but to permit the author who had no wife or children to bequeath by will the right to apply for the renewal."

The result of that interpretation is that the protection of the author "in his old age" becomes "a teasing illusion like a munificent bequest in a pauper's will."[7]

The majority opinion itself demonstrates that the benefit to the author of any such an early sale must necessarily be trifling: In discussing the small consideration paid by the plaintiff to Graff in 1917—over two decades before the renewal date—the majority opinion says that it was adequate because of "the well-known ephemeral nature of popular song hits." Which is to say that in 1917 no one could be expected to pay more than a slight sum for the renewal right to even a most successful song, especially since the purchased right would be valueless unless the author were alive in 1939. Since, as the majority opinion thus acknowledges, an early sale must, inevitably, mean a negligible price, how can the Congressional purpose of protecting the old age of the author be reconciled with the alleged permission to make such a sale? A small sum received by an author when a young man will do little to help him twenty years or more later, in his declining years.

The statute as interpreted by the majority means merely this: An author cannot make a direct "outright" sale before the twenty-eighth year. But, say my colleagues, he can do so by indirection—by making (twenty-two years earlier as here) a specifically enforceable agreement, absolutely binding on him, to have it assigned in his name as soon as the twenty-eighth year arrives. The majority opinion admits that the difference between such a transaction and the forbidden direct "outright" sale is of the tweedledum-and-dee variety. The hocus-pocus employed by the plaintiff makes clear the artificial character of the distinction: The plaintiff, M. Witmark & Sons, relies for its title to the song on an assignment executed in 1939 "to M. Witmark & Sons," signed by George Graff "by M. Witmark & Sons" as George Graff's "appointed attorney." Congress could not have intended that its admitted purpose— to prevent a direct sale prior to the twenty-eighth year—should be so easily circumvented. If it had intended that an anticipatory assignment should be valid, it is strange that in the course of a century, since 1831, it has provided no machinery by which the assignee might perfect the renewal in his own right and in his own behalf and without resort to such hocus-pocus.

It was said of the Statute of Uses[8] that it failed in its purpose and, because of hostile judicial interpretation, had the effect merely of "adding three words to a conveyance." A similar gutting of a statute, by interpretation, will result from my colleagues' decision here.

That my colleagues are obviously uneasy about their interpretation of the Congressional intention expressed in the 1909 Committee report is demonstrated by their desperate recourse to bills subsequently introduced but which failed of passage. Only one of these bills progressed as far as passage by one house of Congress. And since, in one way or another, all those bills expressly provided for assignment of the renewal term, they might be said to show—if they show anything—not, as the majority would have it, "a recognition of the validity under the 1909 Act of assignment of the renewal term," but, on the contrary, that the draftsmen believed that amending legislation was needed to validate such an assignment. While proposed but unsuccessful legislation is at best a feeble basis for statutory interpretation, the only sort of proposed bill which would have had any clear significance, as showing the validity of an assignment under the 1909 Act, would have been one which sought to deprive the author of the power to assign the renewal, or one which explicitly stated that such assignments should thereafter, as theretofore, be valid; but no such proposal was ever made.

The majority opinion cites, in support of its interpretation, the views of seven textbook writers; yet the majority opinion concedes that one such "expert" denied the power to make an early assignment and that the other six were either "hedged" or were only "fairly" definite. There is then no evidence to support the majority's comment that the statute "has fairly uniformly been interpreted one way" by the "experts." And there is not a scrap of evidence, in or out of the record, to sustain my colleagues' statement that "it seems not unreasonable to conclude" that such a belief (i. e., that renewal rights are thus assignable) "doubtless exists throughout the trade."

---

[7] Mr. Justice Jackson concurring in Edwards v. People of California, November 24, 1941, 62 S.Ct. 164, 172, 86 L.Ed. —.

[8] Perhaps not altogether accurately, see Radin, Anglo-American Legal History (1936), 435; 4 Holdsworth, History of English Law, 467 et seq.

My colleagues also refer to a comment made in an opinion of Acting Attorney General Fowler. 28 Op.Atty.Gen. 162. But they disregard the fact that, as that opinion discloses, it was in response to the question whether assignees under "direct assignments of the renewal" are "entitled to renewals"; that the answer to that question was in the negative; and that the remark quoted in the majority opinion here was made merely in passing, as is shown by the following statement: "It is not intended in this opinion to determine any question of law which relates to the relative rights of authors and their assigns, and such rights are mentioned only by way of illustration or argument." Thus qualified, an obiter in such an opinion is entitled to little weight.

It was argued by plaintiff that Congress, when enacting the 1909 Act, must be deemed to have had in mind the judicial interpretation of the 1831 Act, and that the later Act must therefore be construed as the majority construes it. But there had been no clear judicial interpretation of the 1831 Act along those lines. It is not at all plain that, in Paige v. Banks, 1871, 13 Wall. 608, 20 L.Ed. 709, the court, in passing on a contract made in 1828, was thus construing the 1831 Act, as distinguished from the preceding Act of 1790, which differed in its provisions. That Judge Putnam, in White-Smith Music Co. v. Goff, 1 Cir., 187 F. 247, 253, understood Paige v. Banks, supra, as relating solely to the 1790 statute goes to show that it cannot be said that it was clear to Congress in 1909 that the Supreme Court had held that under the 1831 Act the contingent renewal privilege was alienable by the author prior to the date fixed for renewal. In the face of that ambiguity, not much weight should be given to the rule of statutory construction that, when a legislature uses, without change, statutory language which has previously received judicial interpretation, the language of the statute is read in the light of such interpretation. That rule of construction has been much weakened of recent

years. The Supreme Court, in Helvering v. Hallock, 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604, 125 A.L.R. 1368, said: "To explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities. Congress may not have had its attention directed to an undesirable decision; and there is no indication that as to the St. Louis Trust cases [Helvering v. St. Louis Trust Co., 296 U.S. 39, 56 S.Ct. 74, 80 L.Ed. 29, 100 A.L.R. 1239; Becker v. St. Louis Trust Co., 296 U.S. 48, 56 S.Ct. 78, 80 L.Ed. 35] it had, even by any bill that found its way into a committee pigeon-hole. Congress may not have had its attention so directed for any number of reasons. * * * Various considerations * * * might be suggested * * * for the inaction * * * but they would only be sufficient to indicate that we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle."[9] It should be noted that there is nothing in the report of the Committee dealing with the 1909 Act which refers to Paige v. Banks, supra. And, at best, the suggested rule of statutory construction is only one means—"neither final nor conclusive"—of ascertaining the legislative interest, which must give way to more lucid indications of that intent, such as we find here in the Committee reports. Cf. Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 89, 55 S.Ct. 50, 79 L.Ed. 211; Boston Sand Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 73 L.Ed. 170.

The following considerations reinforce my interpretation of those reports: The Constitution, art. 1, § 8, cl. 8, expressly states the very limited purposes for which Congress may authorize patents and copyrights as follows: "to promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." [For the historical background of this clause, see Hamilton, Patents and Free Enterprise, T. N. E. C. Monograph No. 31, 11–27.[10]]

9 Cf. Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167, 128 A.L.R. 1437, where the statute had been left unchanged for half a century after decisions which in that case were repudiated by the court. In Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188, 114 A.L.R. 1487, the statute

had not been changed during almost a century of judicial interpretation, despite proposals to amend it; see dissenting opinion of Butler, J., 304 U.S. at page 86, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A. L.R. 1487.

10 A brilliant criticism of the conventional descriptions of the fight on monopolies waged in the reigns of Elizabeth and

A copyright or patent statute should fulfill that constitutional purpose; if it promoted a monopoly primarily for the benefit of manufacturers or publishers, rather than basically as a reward to inventors or authors, it would verge on unconstitutionality.[11] To the effect that we must keep a sharp eye on the Constitutional purpose of this clause, see Cuno Engineering Corp. v. Automatic Devices Corp., November 10, 1941, 62 S.Ct. 37, 86 L.Ed. ——, and Morton Salt Co. v. G. S. Suppiger Co., January 5, 1942, 62 S.Ct. 402, 86 L.Ed. ——, which disclose a back-to-the-Constitution movement in a field in which the simple words of the Constitution are regarded as at least as good a guide as (if not a better one than) the reams of gloss which have been written since 1789. West Coast Hotel Co. v. Parrish, 300 U.S. 379, 391, 57 S.Ct. 578, 581, 81 L.Ed. 703, 108 A.L.R. 1330;[12] Wisconsin v. J. C. Penney Co., 311 U.S. 435, 444, 61 S.Ct. 246, 85 L.Ed. 267, 130 A.L.R. 1229; cf. Frankfurter, J., concurring in Graves v. People of New York ex rel. O'Keefe, 306 U.S. 466, 491, 59 S.Ct. 595, 604, 33 L.Ed. 927, 120 A.L.R. 1466: "But the ultimate touchstone of constitutionality is the Constitution itself and not what we have said about it." It is worthy of note, also, that, while the individual inventor seems to be rapidly giving way to the corporate research laboratory, so that the patent grant is no longer the same kind of stimulus to personal genius that it once was (see Hamilton, ibid., 152–158),[13] no such development has taken place among authors and song-writers. With respect to such persons, the full achievement of the objectives of the Constitutional provision is still easily possible. An interpretation of the Copyright Act, 17 U.S.C.A. § 1 et seq., which gives them adequate protection will bring that statute more closely in line with the Constitution than will the interpretation adopted by my colleagues. And that the Constitutional limitation was clearly in the mind of Congress in 1831—when the statutory provisions here in question were first adopted—is highly likely; for, just two years earlier, in 1829, the Supreme Court was stressing the language of the Constitutional provision far more than it subsequently did until a very recent date.[14] I note here once more this statement in the 1831 report: "The question is whether the author or bookseller shall reap the reward." The answer of the Committee, constrained by the Constitution, was, necessarily, "the author." Yet the result of the majority opinion in this case is to give the other answer—"the bookseller." For a small price paid in 1917, the "bookseller" here (so the majority rules) acquired the author's contingent right which, when it came into being in 1939, was immensely valuable. And, as already shown, the majority recognizes that, inevitably, the acquisition for an insubstantial sum must be the consequence of permitting a sale of the contingent renewal right at an early date, so that, if there is any substantial reward going to anyone from the renewal, it will not, in such circumstances, enure to the author.

The inherent difference between the difficulties involved in exploiting a patent and a copyright must always have been apparent. And it is noteworthy that at one time when Congress provided that patents should, on a certain showing, be renewable for an additional period, it expressly provided, as it did not do equivalently as to copyrights in the 1831 or 1909 Copyright Acts, "And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the

---

James I is made in a study by Goldwater, The Anti-Monopoly Movement in England, 1606–1624 (unpublished, 1939).

[11] Of course, in order to aid the inventor or author, there must be, via the patent or copyright, some incentives to manufacturers or publishers.

[12] There the court, in repudiating expressions found in Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238, said: "The Constitution does not speak of freedom of contract."

[13] This is not to say that the development of the corporate research laboratory calls for the elimination of the patent system, but merely that, as many persons have recently suggested, that development may necessitate an overhauling of the patent system if it is to serve the constitutional objective. Cf. L. Hand, J.: "Perhaps the [patent] system is outworn * * *" Dewey & Almy Chemical Co. v. Mimex Co., Inc., 2 Cir., January 5, 1942, 124 F.2d 986.

[14] In Pennock v. Dialogue, 1829, 2 Pet. 1, 7 L.Ed. 327, Mr. Justice Story emphasized the constitutional provision. Later, a majority of the court paid it less attention (although there was a deviation in 1882, in Atlantic Works v. Brady, 17 Otto 192, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438). After a long detour, the court has recently returned to the earlier attitude. See Cuno Engineering Corp. v. Automatic Devices Corp. supra.

extent of their respective interest therein * * *."14a

3. The chief prop of the statutory interpretation adopted by the majority opinion is that our society rests on the theory that men should have the greatest possible liberty to make such contracts as they please. I agree that that has, for long and, on the whole, desirably, been, in general, the American attitude. But while, during a part of the 19th century, the devotion to that theory was peculiarly intense, there have been in our history changes in that intensity, as this court has candidly recognized several times within recent weeks. Thus one manifestation of the most extreme enthusiasm for "liberty of contract" was the notion that courts must never depart from "the intention of the parties" to a contract. Yet our court, about a month ago, frankly confessed that that idea was a pious fiction, saying, in an opinion written by Judge Clark, that there had been much confusion in judicial statements concerning "implied" negative covenants and adding: "One may perhaps conclude that in large measure this confusion arises out of the reluctance of courts to admit that they were to a considerable extent 'remaking' a contract * * * where it seemed necessary and appropriate so to do. 'Intention of the parties' is a good formula by which to square doctrine with result. That this is true has long been an open secret." Parev Products Co., Inc., v. I. Rokeach & Sons, Inc., 2 Cir., 124 F.2d 147, 149. And our court has stated that, to the consensual act of the parties in entering into contracts, the courts have attached many obligations which were not in the minds of the parties, that a contract creates a status which imposes such obligations because of considerations of policy.15

Consequently, it is surprising that my colleagues, uncharacteristically, in this particular case interpret the statute as if, today, laissez-faire were still in fullest bloom —as if there were still so strong a presumption against any and all restrictions on the freest possible bargaining that only the plainest language can overcome it, so that the desire of Congress to clog alienability of an author's rights, in order to protect him, must be disregarded unless that desire is set forth in wording as precise as that found in a general release.

Such was, to be sure, the attitude of the courts during the latter part of the 19th century. As Dean Pound has said,16 it was then "taken for gospel that law was moving and must move in the direction of abstract individual self-determination by free control. * * * The judges were imbued with a genuine faith in the * * * doctrine of progress from status to contract.17 Hence it seemed to them that the constitutional requirement of due process was violated by legislative attempts to restore status and restrict the contractual powers of free men by enacting that men of full age and sound mind in particular callings should not be able to make agreements which other men might make freely * * *" This attitude resulted in "an inconsistency between the doctrine of progress from status to contract, as the last generation understood it, and the principles of equity which had developed in our law, especially in the seventeenth and eighteenth centuries. The state courts held for two decades that legislative imposition of contractual incapacities in the relation of employer and employee was arbitrary and hence unconstitutional. But there were existing incapacities with which they did not think of interfering. The surviving common law incapacities could be idealized as 'natural incapacities.' Usury laws were not so easy to explain. But courts said that there had been such laws from the beginnings of American legislation, and some, ignorant of English lawmaking, that they were immemorial and universal. In other words, they were familiar historically and hence reasonable. There remained equitable restrictions on free contract, the doctrine as to penalties, the refusal to allow the holder of a penal bond to recover more than the actual damages, the doctrine of redemption of mortgaged property after the condition had become absolute, the rule against clogging the equity of redemp-

---

14a 1836 Patent Law, 5 Stat. at L. 125, Sec. 18. This renewal feature was omitted in the Patent Act of 1863, 12 Stat. 796, and since then.

15 United States v. Forness, 2 Cir., January 20, 1942, 125 F.2d 928, 936, note 25; Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336, 342–343, notes 18–22.

16 Interpretations of Legal History (1923) 60ff.

17 That this "doctrine" involved a misinterpretation of Maine's epigram, see United States v. Forness, supra, 125 F. 2d 928, 936, note 25.

tion, the rules as to sailors' contracts and sales by reversioners. An eighteenth century chancellor had explained these by saying that necessitous persons were not free.[18] But the courts shrank from so recognizing the facts of industrial employment in the face of the abstract freedom which they had set up as an ideal. The best they could say was that the equitable incapacities also were historical. This amounted to holding that the legislature was unable to create new contractual incapacities; that the lines had been drawn forever in the seventeenth and eighteenth centuries and that no new type of disability could be recognized. Nor did it matter that the underlying principle of these new statutory disabilities was the same as that underlying the disabilities imposed by equity."

The theory of laissez-faire was that the state, the government, was not to interfere beyond a bare minimum. That such was not the actual practice, even when laissez-faire was in its zenith, has been brilliantly shown in the writings of Robert Hale, beginning in 1923.[19] His thesis may be paraphrased thus: In outward appearance, under let-alone-ism, the extensive use of state power is rejected. In fact, however, there is a transference of much of the State's power to individuals. The contracts they make (so far as they are lawful) are enforced and protected by the State through the orders of its courts and its sheriffs. More than that, the individual has a right to refuse to sell or use his property on any terms or except on his own terms. If someone else tries to make him sell or use it except on those terms, the State, through its courts and sheriffs, will protect him from such intrusions. Liberty to contract includes liberty not to contract as one pleases. And government backs up that liberty. Laissez-faire does not mean that the State has given up most of its "interferences," but that the State is used to "interfere" in new ways at the demand of individuals. The power of government is thus exercised, indirectly, by the individual to enforce his bargains and to punish those who try to make him bargain execpt as he chooses.[20] The Hale thesis involves some over-statement. But its dramatic challenge of the conventional thesis helps us to attain a new and valuable perspective. It serves to high-light the public interest in individual contracts. Because of it, we can better understand why, at no time, did let-alone-ism go so far as to obliterate all direct governmental interference with contracts; why, even in the hey-day of laissez-faire, there were retained such doctrines as the rule against perpetuities and the rules as to restraints on alienation, dower rights, spendthrift trusts, the voidability of infants' contracts, etc. Laissez-faire, in other words, meant a shift of emphasis; older attitudes were not killed off but merely submerged. Hale aids us to see the legitimacy of the State's now openly acknowledged interest and direct interference in many kinds of contracts. Nothing, it has been said, exceeds like excess. Laissez-faire went too far.

It is helpful to make an historical approach to the chief interpretative device employed by my colleagues. Their opinion, I note again, relies, in effect, on a supposed spirit of our institutions, tenaciously opposed to all restraints on freedom to contract, which, it is urged, must be read into all American legislation. To make that thesis applicable here, my colleagues must assume that that spirit was operative a century ago when the 1831 Copyright Act

[18] As Chief Justice Taft was to say in 1927; see American Steel Foundries v. Tri-City Council, 257 U.S. 184, 209, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360.

[19] See Coercion and Distribution in a Supposedly Non-Coercive State, 38 Pol. Sci. Q. (1923) 475; Force and The State, 35 Col.L.Rev. (1935) 149; Our Equivocal Constitutional Guaranties, 39 Col.L.Rev. (1939) 563.

[20] Hale's ideas were subsequently restated (although independently) by M. R. Cohen, who says that our "law of contract * * * puts the sovereign power of the State at the disposal of one party to a contract * * * From this point of view, the law of contract may be viewed as a subsidiary branch of public law, as a body of rules according to which the sovereign power of the State will be exercised as between the parties to a more or less voluntary bargain * * * If then the law of contract confers sovereignty on one party over another (by putting the State's force at the disposal of the former) the question naturally arises: For what purposes and under what circumstances shall that power be conferred?" M. R. Cohen, The Basis of Contract, in Cohen, Law and The Social Order (1933) 69, 103–104; cf. Cohen, Property and Sovereignty, 13 Corn. L.Q. (1927) 8; cf. J. M. Clark, Social Control of Business (1926) 132.

was enacted; for the 1909 Act, it is conceded, took over from the earlier statute the provisions which we are considering in the case now before us; accordingly the relevant "time spirit" is that of 1831.[20a] In purporting to find such a spirit, then and still operative, my colleagues are, I think, misreading history. Both they and many of those who have criticized views such as they have expressed[21] have made history too smooth, have oversimplified it: Even in the so-called period of laissez-faire, of course, as in almost any so-called "historical period," there were numerous currents and cross-currents, not a single drift in one direction.[22] The casual observer sees only the current at the surface. And so with excessive laissez-faire: It was merely—and for a relatively short time—the surface current. In the early days of the Republic, mercantilism was still visibly powerful.[23] Alexander Hamilton was certainly not wholly in the grip of that "old Adam"— Adam Smith. Mercantilist notions—and even medieval notions[24]—persisted throughout the 19th century in America, and in

many matters made themselves felt.[25] When the 1831 Copyright Act was enacted, whole-hog laissez-faire was not yet fashionable. However, the vocabulary of full-fledged let-alone-ism became the style with the average well-to-do "educated" American after the Civil War.[26] For a span of years, the constricting vocabulary of ultra-let-alone-ism was fashionable with much of our judiciary. As is not seldom true, the judicial fashion was out of step with a budding popular fashion in words and thoughts outside the court houses.[27] What the courts were saying was not necessarily an index of what Congress had in mind: We lawyers are too much inclined to take our history in legal capsules; we restrict our history reading too much to what we find in the law books, neglecting the fact that "there waft into the courts only occasional gusts in the varied and perpetually changing weather of * * * transactions" occurring in the outer world. "A climate cannot be delineated from a jar of captured raindrops."[28] Even, however, in the court-houses, there were those who, not

---

[20a] To the effect that in construing a statute we may recur to the history of the time when it was passed, see Great Northern Ry. Co. v. United States, 62 S. Ct. 529, 86 L.Ed. —.

[21] Dean Pound, for instance.

[22] Cf. United States v. Forness, 2 Cir., January 20, 1942, 125 F.2d 928.

To shift the metaphor, and to use ten dollar words, there is much cacophony in the symphony of history. Or to restate it, there is usually, at any given moment, not one "spirit of the age," but many such spirits. The bias, conscious or unconscious of the particular historian will often explain why he chooses one special spirit for emphasis.

[23] Cf. Hamilton and Adair, The Power to Govern (1937).

[24] Of course, the labels "medieval," "mercantilism" and "laissez-faire" are each vague catchwords. Each of them symbolizes a complex or congeries of acts and attitudes having many sources. As to some of the many facets and components of laissez-faire, see, e. g., Wingfield-Stratford, The Victorian Cycle (1935); Clarke, 3 Pol.Sci.Q. (1888) 549, reprinted in Beard, Introduction to The British Historians (1906) 609, 612ff; Hamilton and Braden, The Special Competence of the Supreme Court, 50 Yale L.J. (1941) 1319, 1320, note 11. Sabine, A History of Political Theory (1937) 656–665, 672.

[25] As to domestic policy, they did in England, too, moving towards the surface earlier there than in this country; cf.

Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336, 340 and note 12. Our protectionist policy as to foreign affairs was akin to mercantilism.

[26] Not until we reach the opinions of Mr. Justice Field in the Slaughter-House Cases, 1873, 16 Wall. 36, 110, 21 L.Ed. 394 and Butchers' Union v. Crescent City Co., 1884, 111 U.S. 746, 757, 4 S. Ct. 652, 28 L.Ed. 585, do we find Adam Smith's views as to the virtues of individual egotism as the prime protector of public welfare quoted judicially as final and authoritative. In Veazie Bank v. Fenno, 1869, 8 Wall. 553, 541, 19 L.Ed. 482, Smith was referred to with great respect, but his views on taxation were there said not to have guided the Founding Fathers. Cf. Pollock v. Farmers' Loan & Trust Co., 1895, 157 U.S. 429, 555, 630, 631, 639, 640, 15 S.Ct. 673, 39 L.Ed. 759.

[27] "If a statute * * * is apt to reproduce the public opinion not so much of today as of yesterday, judge-made law occasionally represents the opinion of the day before yesterday. But with this statement must be coupled the reflection that beliefs are not necessarily erroneous because they are out of date; there are such things as ancient truths as well as ancient prejudices." Dicey, Law and Opinion in England, 2d Ed., 1914, 369.

[28] Goebel, Editor's Introduction to DuBois, The English Business Company After The Bubble Act (1938) vii.

Professor Walter B. Kennedy remarks

long after the Civil War, asserted their independence of the style in words and ideas, generally prevailing in the court-rooms. Chief Justice Waite was one of them. See Munn v. Illinois, 1877, 94 U.S. 113, 24 L.Ed. 77. Holden v. Hardy, 1898, 169 U.S. 366, 18 S.Ct. 383, 42 L.Ed. 780 and Knoxville Iron Co. v. Harbison, 1901, 183 U.S. 13, 22 S.Ct. 1, 46 L.Ed. 55, are also impressive as signs that the judicial thought-ways were not constantly running towards one point in the compass. The subsequent tussle between opposing attitudes is disclosed in a series of dissenting opinions—with Holmes as leader of the dissenters[29]—which, latterly, have become the majority doctrine.[30] It will not do, then, to interpret the Congressional committee reports, either of 1831 or 1909, as if they were the words of men with but a single and inflexible thought as to the folly of ever interfering with contracts.

Excessive judicial worship of let-alone-ism began, then, to melt away in the 1920's and has disappeared in the decisions, during the last decade, of the Supreme Court.[31] "Whatever may be one's own opinion about the wisdom of trying to save the ignorant and rash from folly it is a recognized power that is used in many ways," said the Court, in 1924, in Dillingham v. McLaughlin, 264 U.S. 370, 374, 44 S.Ct. 362, 364, 68 L.Ed. 742, construing a New York statute. We are obliged no longer to hold that the power to prevent the free disposal of rights was exhausted in such non-statutory rulings, for instance, as that contracts by public officers, executors and receivers assigning their future earnings will not, on grounds of public policy, be enforced,[32] or in the doctrine that equity will refuse to grant specific performance of improvident contracts. Indeed, we have been warned by a successful commercial banker and by able economists that the passion for excessive liquidity—the eagerness to make every kind of property or idea immediately convertible into cash—was one of the causes of the Great Depression which began in 1929, and that, unless we do something to curb that zest for instant monetization of everything, our profit economy may collapse.[33]

The former judicial repugnance to any legislative interference with free bargaining involved a blindness to the effects on the public—the community—of the conduct of individuals. Lately, we have be-

---

that "thirty years before the United States Supreme Court declared the Minimum Wage Law of the District of Columbia to be unconstitutional, Pope Leo XIII vehemently defended the right of the worker to a living wage in his famous encyclical, Rerum Novarum, and argued for such economic reform on the ground of natural law and natural justice." My Philosophy of Law (1941) 147, 159.

[29] Sometimes his views prevailed: In Noble State Bank v. Haskell, 1911, 219 U.S. 104, 31 S.Ct. 186, 55 L.Ed. 112, 32 L.R.A..N.S., 1062, Ann.Cas.1912A, 487 he spoke for the Court, announcing in effect, that the judiciary, in a democracy, should, when possible, accept the ideas prevailing with the majority of the people as expressed in legislation. Zane, shocked by that decision, denounced it as a capitulation to the wicked ideas of the Germans, with whom we were then at war. See Zane, German Legal Philosophy, 16 Mich.L.Rev. (1918) 287; cf. 2 Holmes, Pollock Letters (1941), 3, 6, 42. And, for a time, the majority of the Court turned its back on the views expressed in the Noble State Bank case.

The story of the course of judicial attitudes in this field is excellently told by Paxton Blair, Bench, Bar and Social Change, an address before the N. Y. State Bar Ass'n, January 24, 1942.

[30] Informed by the past, we should, with proper scepticism, regard the view now prevailing as a new fashion, not certain to last forever, even if we admire it. Certainly there are other opposing views not far below the surface. That is no cause for regret: They may prevent a drift of opinion from becoming a flood which will erode too much.

For some healthy scepticism concerning the current anti-laissez-faire drift by one who likes it, see Bossard, Sociological Fashions and Societal Planning, 14 Social Forces (1935) 186.

[31] See discussion of this change and citation of pertinent cases in Hume v. Moore-McCormack Lines, 2 Cir., 1941, 121 F.2d 336.

[32] In re Furness, 2 Cir., 75 F.2d 965; Fischer v. Liberty Bank & Trust Co., 2 Cir., 61 F.2d 757; Bliss v. Lawrence, 58 N.Y. 442, 445, 450, 17 Am.Rep. 273; Matter of Worthington et al., 141 N.Y. 9, 12, 35 N.E. 929, 23 L.R.A. 97.

[33] See testimony of Ralph W. Manuel, President, Marquette National Bank of Minneapolis, May 22, 1939, before the Temporary National Economic Committee, Hearings, pp. 3710, 3713-3724; Berle and Pederson, Liquid Claims and National Wealth (1934).

gun to see that any business is "affected with a public interest," if the legislature so decides.[34] In reaching that conclusion, the courts have, once more, realized that what one man does with his life often affects all the rest of us. If he is infected by a disease, many others may be victimized. If he contracts dire poverty, crime may result and a large group may suffer.[35] And so it is with free bargaining.[36] For a contract may be something more than a private affair of the contracting parties; it may vitally affect the interests of the public. Once that was the prevailing view; in the medieval period, and for a long time subsequently, it was taken for granted that there was an overriding social or public aspect of individual trafficking. Cf. Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336, 338. That emphasis in England on the public obligations of private persons was, however exploited in the interests of dictatorial royal dynasts and, later, to benefit an economic oligarchy.[37] A revolt of enterprising individuals result-

ed. Their slogans were laissez-faire and the natural rights of the individual. "As is natural in all revolts, absolute claims on one side were met with absolute denials on the other. Hence the theory of the natural rights of the individual took not only an absolute but a negative form: men have *in*alienable rights, the State must never interfere with private property, etc."[38] "In the fierce fight against * * * numerous irrational, tyrannical and oppressive restraints men jump to the conclusion that the absence of all restraint is a good in itself and indeed the one absolute good. * * * "[39]

Recognition today of the unwisdom of excessive liquidity or excessive individualism does not at all mean a commitment to *rigidity, regimentation, or undue paternalism.* Cf. Russell Davenport, *This Would Be Victory*, 24 Fortune (1941) 45, 136-144. Here, as almost everywhere in life, there is need for intelligent compromise.[40] "Most of the issues of human and social relationships are not of the

---

[34] Nebbia v. People of New York, 1933, 291 U.S. 502, 54 S.Ct. 505, 514, 78 L. Ed. 940, 89 A.L.R. 1469.

[35] Carmichael v. Southern Coal Co., 1937, 301 U.S. 495, 516, 517, 57 S.Ct. 868, 81 L.Ed. 1245, 109 A.L.R. 1327.

[36] See Paxton Blair, loc. cit.

[37] See, e. g., Wingfield-Stratford, 1 History of British Civilization (1928) 498ff; J. M. Clark, Social Control of Business (1926), 26ff.

[38] M. R. Cohen, Property and Sovereignty, 13 Cornell L.Q. (1927) 8, reprinted in Cohen, Law and The Social Order (1933) 41, 57.

[39] M. R. Cohen, The Basis of Contract, 46 Harv.L.Rev. (1933) 553, reprinted in Cohen, Law and The Social Order (1933) 69, 75, 76.

[40] Cf. Hudson County Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828, 14 Ann.Cas. 560; dissenting opinion in Chrestensen v. Valentine, 2 Cir., 122 F.2d 511, 522, 523; Clark v. United States, 289 U.S. 1, 13, 53 S.Ct. 465, 77 L.Ed. 993.

It is of interest, in the light of subsequent events, to compare the absolutistic arguments of Joseph Choate, asserting before the Supreme Court in 1895 that any federal income tax would bring about communism, with those of James Carter, in the same case, that such a tax, intelligently applied, by reducing the undue concentration of wealth, would help to prevent communism and the breakdown of democracy. See Pollock v. Farmers'

Loan & Trust Co., 1895, 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759. For Choate's argument, see 157 U.S. page 532.

Carter, a conservative lawyer and one of the leaders of the bar, arguing, on behalf of a trust company, in favor of the constitutionality of the tax, said (157 U.S. page 517): "It is alleged by the counsel for the appellant that the income tax—and this they consider its most monstrous form of injustice—falls upon two per cent only of the population of the United States; but what must we think of the fact that this two per cent. have been paying but a trifle more than two per cent. of the $500,000,000 [of taxes] while of the annual income of the nation, after deducting what would be sufficient to furnish a living for the people, they have been receiving probably more than fifty per cent.? At the same time another impressive and startling fact, not adverted to by them, has also been receiving more and more of the attention of the people of the country—I mean the growing concentration of large masses of wealth in an ever diminishing number of persons. It was impossible to avoid the suggestion that there was some connection between these striking facts, and it was also impossible that they should not form the point of conflict around which political contentions would gather. They did finally succeed in dividing the two great political parties of the country. At last the party complaining of these things gained an ascendency in the legislative

black-and-white variety."[41] We should beware of the either-or dogmatizers. It is unnecessary to make a hard-and-fast, all-or-nothing, antithesis between complete formal individual freedom and complete governmental guardianship for everyone. But it is necessary to observe that individualism, if utterly unrestrained, becomes self-devouring.[42]

"More and more," said Lord Macmillan in 1935,[43] "the main issue in political science has come to be—not whether the State should intervene at all in the regulation of our daily lives but where the frontier line ought most wisely to be drawn between the province of state activity and that of individual enterprise. On all hands it is now recognized that the policy of laissez-faire, which gave us no doubt our industrial and commercial supremacy but also gave us our slums and many other attendant evils, must give place to a new regime.   *  *

We have traveled far since Tom Paine—that early champion of the people's rights—proclaimed that 'The more perfect civilization is, the less occasion it has for government. * * * Sedgwick * * * recognized that * * * social legislation is essential to the preservation of the liberty of the individual. Such measures, he saw, may promote rather than diminish freedom."[44]

When the philosophy of 100% individualism was in vogue, the courts often soft-pedalled such considerations. They devised and interpreted legal rules and read statutes under the influence of their own notions of public policy. That process may have been largely unconscious. But, as Mr. Justice Holmes often said, there was strong policy-making in those judicial decisions.[45] The judges who decided them also uttered verbal repudiations of judicial legislation.[46] But the demolition of the

counsels, and efforts were made to devise a remedy. This income tax is a part of that remedy. The view taken by the Congress which passed the tax law in question is plain upon its face. The object was to redress in some degree the flagrant inequality by which the great mass of the people were made to furnish nearly all the revenue, and leave the very wealthy classes to furnish very little of it in comparison with their means * * *."

[41] Mr. Justice Douglas, Democracy and Finance (1940) 243.

[42] "To put the matter more generally, ought every person of full age, acting with his eyes open and not the victim of fraud but who nevertheless is placed in a position in which from the pressure of his needs he can hardly make a fair bargain, to be capable of binding himself by a contract? If these and the like questions be answered in the affirmative, an individual's full contractual capacity is preserved, but he is in danger of parting, by the very contract which he is allowed to make, with all real freedom. * * * The difficulty is in all these cases * * * the same; there is a perpetual danger that unlimited contractual capacity which is looked upon as an extension of individual freedom, may yet be so used by some individual as to deprive himself of the very freedom which it is assumed to be the exercise." Dicey, Law and Opinion in England, 2d Ed. 1914, 152, 153; cf. 260ff.

See also Dawson, Economic Duress and Fair Exchange in French and German Law, 11 Tulane L.Rev. (1937) 346; 12

ibid. (1937) 43; Cohen, The Basis of Contract, supra.

[43] Law And Other Things (1937) 1, 7–9.

[44] In 1909, President Taft advocated the establishment of a postal savings bank. He replied to some of his critics who, he said, argued that such a bank "is a very paternalistic institution; that it has a leaning towards state socialism. * * * Now I am not a paternalist, and I am not a socialist, and I am not in favor of having the government do anything that private citizens can do as well or better. * * * [But] we have passed beyond the time of * * * the laissez-faire school which believes that the government ought to do nothing but run a police force." See Pringle, The Life and Times of William Howard Taft (1939) 518.

[45] See e. g., Holmes, Science and The Common Law (1879) reprinted in Holmes, Book Notices, etc. (Shriver, 1936) 10, 11; Vegelahn v. Guntner, 1896, 167 Mass. 92, 44 N.E. 1077, 35 L.R.A. 722, 57 Am.St.Rep. 443; The Path of the Law (1879); Collected Legal Papers (1920) 181, 184.

[46] For candid avowals that there is and (within proper limits) must be judicial legislation, see Holmes, J., Southern Pacific Company v. Jensen, 1917, 244 U.S. 205, 221, 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A.1918C, 451, Ann.Cas.1917E, 900; Cardozo, The Nature of the Judicial Process (1921) 10, 103, 113, 146–149; Dicey, Law and Opinion in England (2d ed. 1914) 361–398, 483–494; Thayer, A Preliminary Treatise on Evidence (1898)

purposes of Congress, through stingy statutory interpretation, is the most emphatic kind of judicial legislation.[47] Our job is, so far as possible, to enforce the aims of Congress. We should, in the instant case, carry out what Congress meant to achieve for the protection of authors in the Copyright Act, and should not carry out, without modification, the policy of the judicial legislation found in the judicial decisions of the let-alone-ist era.

It is of considerable interest to note some of the cases cited by the majority to support their assertion that the Copyright Act must be read in the light of an alleged strong policy, said to be embedded in our legal system, unfriendly to any "restriction on free assignability": (a) There is the citation of an Illinois decision declaring unconstitutional a statute regulating assignments of wages and salaries. Massie v. Cessna, 239 Ill. 352, 88 N.E. 152, 28 L.R.A., N.S., 1108, 130 Am.St.Rep. 234.[48] To cite such a case indicates sympathy, which I doubt whether my colleagues entertain, with an attitude that such legislation, because it interferes with liberty of contract, is invalid; that attitude the United States Supreme Court has, in recent decades, flatly rejected.[49] (b) The majority also cites our recent decision, In re Barnett, 2 Cir., 124 F.2d 1005 where, following early New York decisions (as we were obliged to do under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487), we held that an assignment of an expectancy under a will is effective, and cannot be set aside by a trustee in bankruptcy or a judgment creditor; there was in that case no statutory declaration of a contrary policy, nor was it even suggested that the consideration for

the bargain was inadequate. (c) My colleagues also cite what they themselves describe as "the unusual case" of Kelly v. Kelly, 11 Cal.2d 356, 79 P.2d 1059, 119 A.L.R. 71, in which an interest under a spendthrift trust was allowed, by indirection, to be assigned.

It is important that the "property" here involved is a creature of statute and not a common law "right of property." In Powell v. Head, L.R. 12 Ch.D.(1879), 686, 688, it was argued that the part owner of a play could grant a license for its production without the consent of the other owners because, at common law, one tenant in common of a chattel has a right to use the chattel as he pleases. Jessel, M. R., rejected this argument saying: "I am not at all inclined to extend the antiquated and barbarous doctrines, which have been set aside partly by the Legislature and partly by the Courts of Equity, to new rights created by statute, and which are of a character wholly different from the rights of property to which these ancient doctrines apply." Cf. Holmes, J., dissenting, in Truax v. Corrigan, 257 U.S. 312, 342, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375.

We know today that legal recognition of differences between different types of persons is not incompatible with the concept of "equality before the law," intelligently interpreted. Hughes, C. J., in Morehead v. People of New York ex rel. Tipaldo, 298 U.S. 587, 627, 56 S.Ct. 918, 80 L.Ed. 1347, 103 A.L.R. 1445, and in West Coast Hotel Co. v. Parrish, 300 U.S. 379, 391, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330. Protection for those unable adequately to protect themselves must be afforded by any civilized legal system.[50] And when Con-

---

318, 319, 327, 331; Dickinson, Administrative Justice and the Supremacy of Law (1927) 122, note 22; 209, note 23.

"What was the law in the time of Richard Coeur de Lion on the liability of a telegraph company to the persons to whom a message was sent?" Gray, The Nature and Sources of Law (1900) Sec. 222.

[47] Cf. Paul, 1 Federal Estate and Gift Taxation (1942) 44 and note; 62, 86, 87 and notes 33 and 34.

[48] Curiously, my colleagues cite Fortas, Wage Assignments in Chicago, 42 Yale L.J. 526, in which the author severely criticizes cases relying on that holding, and concludes (at p. 557) that "it seems doubtful that any restriction short of

prohibition will cure the ills wage assignments have propagated in Chicago * * *"

[49] Morehead v. People of New York ex rel. Tipaldo, 298 U.S. 587, 56 S.Ct. 918, 80 L.Ed. 1347, 103 A.L.R. 1445; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330.

[50] Our system recognizes divers restraints on complete liberty of contract. Among them are the enforcement of spendthrift trusts; refusal to enforce the contract of a man to stay out of business forever or to allow his arm to be cut off; punishment of those who make suicide pacts, etc. As to the use of standardized contracts of insurance and the

gress has, as in the case of copyrights, expressed such a policy, there is no reason why the courts should frustrate it. It has been held that a person included within the provisions of a Workmen's Compensation Act cannot validly contract himself out of the statute; courts have reached that result even when the statute did not prohibit such a contractual waiver of the benefits of the legislation. Wass v. Bracker Construction Co., 185 Minn. 70, 240 N.W. 464, 466; cf. Powley v. Vivian & Co., Inc., 169 App. Div. 170, 177, 154 N.Y.S. 426. Here, where the Committee reports show the legislative intent to arrive at a similar limitation on free bargaining by an author, it is difficult for me to see why we should pay no respect to that intention.

I agree that the courts must not rewrite statutes and import into them what they think desirable when Congress has remained silent. But there is a marked difference between the silence of Congress and a statement of its purpose not expressed with complete nicety, a middle ground between Congress saying nothing and Congress shouting. The guiding principle was formulated as follows by Mr. Justice Holmes:[51]

"We recognize that courts have been disinclined to extend statutes modifying the common law beyond the direct operation of the words used, and that at times this disinclination has been carried very far. But it seems to us that there may be statutes that need a different treatment. * * * The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before.

Twice recently the Supreme Court has quoted that language with approval and applied that canon of interpretation.[52] I believe it is our duty to do likewise. My colleagues say they are willing to abide by a Congressional policy against assignability of a contingent copyright renewal. I fear that they have just missed a real opportunity to do so.

---

like, required by statute, see Isaacs, Standardizing of Contracts, 27 Yale L. J. (1917) 34; Llewellyn, What Price Contract? 40 Yale L.J. (1931) 704, 731ff; Goebel, Trends in The Theory of Contracts in the United States, 11 Tulane L.Rev. (1937) 413, 421; M. R. Cohen, The Basis of Contract, supra.

The concept of "coercion by economic pressure" has received overt judicial recognition in United States v. Butler, 297 U.S. 1, 71, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914. It has been applied to "contract law" in many ways. For a recent case decided by this court, see

United States Navigation Co. v. Black Diamond Lines, 2 Cir., 124 F.2d 508. Cf. Havighurst, Consideration, Ethics and Administration, 42 Col.L.Rev. (1942) 1, 27–30.

[51] Johnson v. United States, 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194.

[52] United States v. Hutcheson, 1941, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788; Kcifer & Keifer v. Reconstruction Finance Corp., 1939, 306 U.S. 381, 391, note 4, 59 S.Ct. 516, 83 L.Ed. 784; cf. Stone, The Common Law in the United States, 50 Harv.L.Rev. (1936) 4, 13.